**STATE of Tennessee, Plaintiff-Appellee,**

v.

**Wayne ADKINS, Defendant-Appellant.**

Supreme Court of Tennessee.

March 28, 1983.

Mark C. Hicks, Jr., Robert D. Arnold, Johnson City, for defendant-appellant.

Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, for plaintiff-appellee; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

BROCK, Justice.

The defendant, Wayne Adkins, was convicted of first degree murder and sentenced to death by electrocution for the killing of Junior Adams on May 22, 1979, at about 7:30 p.m. and has appealed the conviction and sentence to this Court.

At about 7:45 p.m. on May 22, 1979, Steve Frazier and James Dupkossky discovered the bullet riddled body of Junior Adams lying along the edge of an unnamed, single track, dead-end road .45 miles from its intersection with the Starr Mill Road in Washington County. Upon making the discovery Frazier and Dupkossky hastily operated their green 1973 Chevrolet automobile in reverse back down the dirt road to its intersection with Starr Mill Road where the Bailey residence was located. They promptly informed the Baileys of their discovery and Mrs. Bailey reported the discovery of the dead body to law enforcement authorities by telephone at 7:50 p.m. Later that night the defendant Adkins was arrested and charged with the murder.

The State's evidence was wholly circumstantial in nature. Except for the introduc-

tion of evidence of a blood alcohol sample taken from the deceased which measured .12%, the defendant offered no evidence.

In the sentencing phase of the trial the State introduced evidence of a 1965 indictment against the defendant charging burglary and larceny that resulted in a plea of guilty and conviction for attempting to commit a felony.[1] The State also produced evidence of a 1965 indictment of the defendant for abduction and armed robbery which resulted in a plea of guilty and conviction for larceny from the person. It was not shown whether a weapon was used in the perpetration of this offense. But, the State also proved that the defendant had been convicted in 1965 of second degree murder based upon evidence that the defendant and three other persons had killed a homosexual while in jail. Also during the sentencing phase of the trial, the State produced evidence that two assault charges were then pending against the defendant, one of which was almost a year old and the other of which was an indictment handed down about a week prior to the murder in this case. The State not only proved that the assault charges were pending but also introduced statements from witnesses to the incidents upon which the pending charges were based. Moreover, at the sentencing phase of the trial, the State was permitted to introduce evidence that the defendant had been guilty of public drunkenness, loitering, illegally possessing whiskey with intent to resell, and of having been absent without official leave from the Army.

The jury found two aggravating circumstances, (1) that "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," and (2) the defendant had been previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person.

1. This offense would not necessarily be associated with the use of any weapon.

The defendant strongly urges on this appeal that reversible error was committed in the sentencing phase of the trial; he charges that T.C.A., § 39–2404, was violated by the introduction of evidence of the two pending assault charges, the introduction of the statements of witnesses concerning those assault charges and the introduction of evidence of public drunkenness, loitering, illegal possession of whiskey with intent to resell, and of being absent without official leave from the Army.

We affirm the verdict and conviction of murder in the first degree but we reverse the sentence of death because of the introduction of evidence in violation of T.C.A., § 39–2404, last above mentioned.

# I

## GUILT PHASE

The most substantial issue raised by the defendant respecting the guilt phase of his trial is his insistence that the evidence is insufficient to support the conviction. The issue is a close one, but our conclusion is that the evidence, considered as a whole, and in the light most favorable to the State, is sufficient to support the verdict.

The standard to be applied in our review of the sufficiency of the evidence is to be found in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[2] and in Rule 13(e), T.R.A.P. The constitutional standard was set out in *Jackson v. Virginia, supra*, as follows:

"After *Winship* [*In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.' (Citation omitted.) Instead, the relevant question is whether, after viewing the evidence in the light most favor-

able to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Citation omitted.) This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." (Emphasis original.) 99 S.Ct. at 2788–89.

Rule 13(e) of Tennessee Rules of Appellate Procedure provides:

"Findings of guilt in criminal actions, whether by the trial court or jury, shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."

We now summarize the State's theory and the evidence upon which it relies to sustain the conviction. When found, the victim's body had sustained ten wounds from bullets, according to the pathologist, Dr. Thomas Potter. The victim had died from shock and loss of blood; no vital organ had been struck by any of the bullets. At the time the autopsy was made on the day following the finding of the victim's body, the time of death could not be determined. The ten bullet wounds represented the entry and exit points of either four or five bullets. No bullets were found in the victim's body. A police officer who arrived at the scene shortly after the victim's body was discovered examined a pool of blood beneath the head and body but found no bullet in it. However, it was dark and raining at that time. The next day, May 23, 1979, a further investigation at the

2. *Cf. Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

scene where the body was found resulted in the discovery of a portion of a .38 caliber bullet lying in the blood on the ground where the victim's body had lain.

At the time this murder occurred the defendant was living with Dorothy Mayes. He was employed by Walt Whaley, alias, King, as a bartender at a beer tavern in Johnson City called "Nappy's." Nine days before the murder occurred Dorothy Mayes gave the defendant her check for $100.00 payable to Walt Whaley to be used to pay for a .38 caliber pistol which the defendant purchased from Whaley. A holster and cartridges were also obtained. The defendant carried this pistol with him on the day of the murder, wrapped in a towel, and placed it under the driver's seat in a blue Plymouth Volare station wagon, also owned by Dorothy Mayes, but driven by the defendant throughout the day of the murder.

In the forenoon of the day of the murder the defendant, accompanied by Kenneth Dykes, began driving about the city of Johnson City in the Mayes' Volare and drinking beer in large quantities both in the automobile and at various beer taverns located in the area. Dykes testified that the defendant showed to him the .38 caliber pistol which he had in the car and said that he had bought it from Walt Whaley (King).

The defendant, accompanied by Dykes, drove to a trailer park in search of the victim, Junior Adams. David Ealey who lives near the location of Junior Adams' trailer testified that he was standing outside his residence between 4:00 and 5:00 p.m. on May 22, 1979, when the defendant and a dark haired man drove up in a blue station wagon resembling the one owned by Dorothy Mayes. The defendant approached Mr. Ealey and inquired where Junior Adams lived. The witness pointed out the Adams' trailer to the defendant who was then observed by the witness to go to the door of Adams' trailer and to enter therein. At this point Ealey went to his residence for dinner and did not observe the departure of the defendant and his companion.

It is not shown whether the victim, Adams, was at home at the time of this visit by the defendant. However, the inference is that he was not at home at that time but was in fact in the downtown area visiting some of the beer taverns there. A cab driver, Tony Phillips, testified that the victim, Adams, came by his taxi cab lot at a time estimated by Phillips as between 3:30 and 3:45 p.m. on May 22, 1979. He testified that at this time the defendant was also observed to be across the street from the cab lot and that the defendant motioned for the victim, Adams, to come over to where the defendant was standing on the other side of the street, that Adams did cross the street and was observed walking down the sidewalk with the defendant. This testimony by Phillips was corroborated by the testimony of David Stewart, another cab driver.

The testimony indicates that, from this point on, the victim was in the company of the defendant and Kenneth Dykes until shortly after 7:00 p.m. on that date. The three drank beer together at various beer taverns and in the Mayes' station wagon driven by the defendant.

The witness, Billy Joe Tipton, testified that at approximately 7:05 p.m. on May 22, 1979, he encountered the defendant, the victim, Adams, and Kenneth Dykes at Nappy's beer tavern and that he took Dykes with him, leaving the defendant and Adams at the beer tavern. Tipton also testified that at the time the defendant did not appear to him to be "drunk."

Myrtle Lyons, who is married to the uncle of the victim, Junior Adams, testified that she lives on Starr Mill Road and that at about 7:00 p.m., or a short time thereafter, she saw Junior Adams pass by on the Starr Mill Road, that he was a passenger in a blue car or station wagon and that he waved a greeting to her as he passed and cried out "Hi, Aunt Myrtle." She testified that she could not see who was driving the vehicle but was certain that it was her nephew, Junior Adams, whom she observed on the passenger's side as the vehicle passed.

Bill Bailey, a 17 year old high school Senior with a 4.0 scholastic average, testified that he lived with his family in a house

located at the corner of Starr Mill Road and the unnamed, dead-end, single track road on which the victim's body was found. He testified that between 7:15 and 7:25 p.m. on May 22, 1979, he was in the yard of his residence doing chores when he saw either a Dodge Aspen or a Plymouth Volare automobile or station wagon decorated with wood-grain side panels going up the unnamed road beside his house in a direction away from Starr Mill Road. He testified that his view of this vehicle was somewhat obstructed because the roadbed is several feet below the level of the ground of his yard located between the place where he was standing and the vehicle. He was unable to distinguish any occupants of the vehicle but was certain that it was either an Aspen or Volare because of the taillights which he testified were unique in automobiles at that time. He explained that he was something of "an automobile freak." He fixed the time of this observation by relating it to a television program which was in progress at the time. He did not see that vehicle return. Later, at the police station, he observed the Mayes' Volare station wagon, painted blue with dark wood-grain side panels and testified that the vehicle which he observed on the night of the murder "looked like it."

Officer Victor Canselor of the Washington County Sheriff's Department received the call reporting the dead body at approximately 7:50 p.m. on May 22, 1979, and recorded this in his log. Soon thereafter officers and ambulance crews drove to the location of the dead body and the investigation began which culminated in the arrest of the defendant at approximately 3:00 a.m. that night. The investigating officers traced the movements of the victim on the day of the murder and this led to the defendant's arrest.

The officers went to the residence of Dorothy Mayes where they gained entry and found the defendant in bed. They awakened him and informed him of his *Miranda* rights; obtained a waiver of those rights and proceeded to interrogate him. The defendant's statement given at this time was put in writing and signed by the

defendant and witnessed by the officers. This statement is quite detailed and in it the defendant recounts much of the happenings that are hereinabove set out in this opinion. In this statement is found the following:

"I then saw Junior Adams across the street at the Diamond Cab Company. He came over. I asked him if he wanted to drink some beer, he said yeah. We then went into the King's Inn and Pat told me Bill Tipton was looking for me. I told her I had saw him. We walked on through, then I went to the car. Junior got into the back, Kenney and myself got in the front. I asked Junior if he wanted a beer, he said yes. I then asked what kind, he said anything. I then handed him a Budweiser. We then drove through town, and Ken got out at the parking lot at Nappy's, and Junior got into the front seat. We drove around and drunk that beer. We drove toward the Milligan Highway. After we drunk that beer I told him I would drop him off downtown, I was going to wrestling. I then dropped him off at Tipton and Buffalo Street. I then went back to Nappy's and got another beer."

In this statement the defendant also stated that he had the .38 caliber pistol with him on the day of the murder but that he sold it:

"... when a guy stopped and asked if he could buy a gun from me. I told him I had one for sale for $30.00. I then took him to the car and got the gun, he gave me $30.00 for it. He paid me in a twenty, and two five's."

Detective James H. Taylor testified that he was one of the officers who effected the arrest of the defendant and that when the defendant got out of bed Mrs. Mayes said to him "Where is the pistol?" and the defendant replied, "I sold it." Detective Taylor also testified that during the interrogation of the defendant, the defendant stated, referring to the victim:

"I didn't like the snitching little s.o.b. but I didn't kill him either."

Shirley Ann Holder testified that she at one time lived with the defendant for a period of about four months and that in June, 1977, the defendant had shot her in the presence of Junior Adams at Adams' trailer. She testified that Adams was in a position to observe the shooting and that the bullet "tore up [her] stomach" and was still located near her spine. She testified that she had given testimony regarding this shooting of her to a grand jury about two weeks prior to the murder of Junior Adams. It is shown elsewhere in the record that the grand jury returned an indictment a few days prior to Adams' murder, charging the defendant with the assault on Shirley Holder. Witness Holder further testified that on May 22, 1979, she was present when the defendant was talking to Junior Adams and heard the defendant ask Adams "what was he going to tell at the trial" and that Junior replied that he was "going to tell the _____ truth." On cross examination, she admitted that she had not related this conversation between Adams and the defendant until the day prior to the beginning of the trial in this case at which time she related the conversation to the District Attorney.

It is the State's theory that the defendant killed Adams, motivated, at least in part, by the prospect that Adams intended to be a witness for the State in the prosecution of the defendant for the shooting of Shirley Ann Holder.

We conclude that a rational trier of fact could find beyond a reasonable doubt from the evidence above summarized that the defendant is guilty of the first degree murder of Junior Adams. Certainly, there can be no question of the *corpus delicti* and, in our opinion, the defendant's criminal agency also is shown by the evidence.

Moreover, a reasonable trier of fact could find beyond a reasonable doubt from the evidence that the element of deliberation and premeditation was shown. The decedent's death was caused by four, perhaps five, shots and we have held that repeated blows may constitute evidence of deliberation and premeditation. *State v. Bullington,* Tenn., 532 S.W.2d 556 (1976). A possi-

ble motive was shown and apparently was believed by the jury because it listed as an aggravating circumstance an intent to avoid lawful arrest or prosecution, the motive being to eliminate Adams as a witness for the State in the prosecution of the defendant for the shooting of Shirley Ann Holder. It is shown that on the afternoon of the murder the defendant, accompanied by his friend Dykes, went to the home of the victim to seek him out and that later, in the downtown area, the defendant called the victim to him and asked him what he intended to testify in the upcoming trial of defendant for the assault upon Shirley Ann Holder to which the victim replied that he was going to tell the truth.

██ Was the jury justified in concluding from the evidence that the defendant was not too intoxicated to have formed a deliberate and premeditated design to kill the victim? We think that it was. Voluntary intoxication is never a justification for a crime but its existence may negate a finding of specific intent. *State v. Bullington, supra,* at 560. If the accused is so intoxicated that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree; and, even when an intoxicated defendant is capable of forming specific intent, his drunkenness may be considered in determining whether he specifically intended the particular act for which he is on trial. *State v. Bullington, supra.*

It is shown by the evidence that the defendant spent most of the day of the murder drinking beer with various persons. He admitted this in his written statement and Peggy Greer, the bartender at Nappy's, sold to defendant at least two six-packs of Miller's beer and a six-pack of Budweiser, as well as two quarts of Budweiser that day. In addition, Kenneth Dykes, defendant's companion, testified that he spent much of the day drinking with the defendant, that they purchased about a half case of beer at Nappy's bar alone and that together they went to most of the bars in town. Dykes estimated that he drank about 24 bottles of beer that day and that

he estimated the defendant to have drunk about the same amount. Nevertheless, the witness, Billy Joe Tipton, testified that when he saw the defendant about 7:05 p.m. on the evening of the murder the defendant did not "seem to be drunk." The defendant's paramour, Dorothy Mayes, testified that on the night of the murder the defendant came home with her car between 8:00 and 8:30 p.m., that she and the defendant drove out one of the highways in Johnson City to meet Walt Whaley around 9:00 p.m., that the defendant did the driving and that she did not think that the defendant had had too much alcohol to drink to adversely affect his driving. Officer Harold Wood testified that at the time defendant was arrested at about 3:00 a.m. he appeared to be groggy and "a little hung over" but that he walked "pretty steady." When the officers awakened the defendant, he got up and seemed to have no difficulty in preparing coffee and in giving a statement to them. We conclude from this evidence that the jury was warranted in finding that the defendant was capable of premeditation and deliberation at the time of the killing of Junior Adams.

During the voir dire examination of prospective jurors the prosecutor, Mooney, made the following statement to the jurors:

"Will you accord him that presumption so long as he is entitled to it? And he is entitled to that presumption *only up to the point where the State is making out its case.* This could be with one witness. It could be the first witness. It could be the tenth witness. It could be the last witness. It could be a rebuttal witness after the defendant's proof is put on, but once we have made out a case, that presumption of innocence if it were another person seated at that table would get up and walk out .... In other words, Ladies and Gentlemen, if this case is in your hands and goes to that jury room with you, you are not taking with you the presumption of innocence of that defendant any longer. Will you accord him that presumption but only until such time as we make out our case?"

The defense objected to this statement and the court overruled the objection. In this there can be no doubt the court erred because the statement of the prosecutor was a misstatement of the law. However, the trial judge did say that he would later instruct the jury concerning the presumption of innocence and he did in fact later give the jury correct instructions on that subject. Of course, the law presumes that the defendant is innocent of the charge against him and this presumption remains with the defendant throughout every stage of the trial and it is not overcome unless from a consideration of all of the evidence in the case the jury is convinced beyond a reasonable doubt that the defendant is guilty. Since the law was correctly charged to the jury by the trial judge in his final instructions, we conclude that the error in failing to sustain defense counsel's objection at the time the misstatement of the law was made by the prosecutor was harmless error.

The defense makes other complaints concerning statements by the prosecutor during voir dire examination and we have examined each of them but find that no reversible error was committed. In each instance the trial judge correctly instructed the jury on the points of law in question.

The defense also complains of the comments of the trial judge in connection with his declaration that the witness Walt Whaley was a hostile witness, contending that telling the jury that Mr. Whaley had been declared a hostile witness was to improperly comment upon the evidence. We find no error; the court simply explained its action and later instructed the jury correctly respecting hostile witnesses. Moreover, it was no error for the court to declare Whaley to be a hostile witness of the State.

Likewise, we conclude that there is no merit in the insistence of the defendant that the trial court erred in allowing the prosecutor to read a former statement to a witness because, at the time, the witness did not have her eyeglasses and was unable to read the statement herself.

PUNISHMENT PHASE

T.C.A., § 39–2–203, provides, in pertinent part, as follows:

"(i) No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, *which shall be limited to the following:*

    (1) . . . .

    (2) The defendant was previously *convicted* of one or more felonies, other than the present charge, which involved use or threat of violence to the person;

    \*    \*    \*    \*    \*    \*

    (6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

    \*    \*    \*    \*    \*    \* "

(Emphasis added.)

This portion of the statute was construed by this Court in *Cozzolino v. State,* Tenn., 584 S.W.2d 765 (1979), in what we considered to be plain language, as follows:

"[T]he only issues that the jury may properly consider in reaching a decision on the sentence to be imposed are whether the State has established one or more of the aggravating circumstances beyond a reasonable doubt and, if so, whether any mitigating factors have been shown that would outweigh those aggravating circumstances." 584 S.W.2d at 768.

This construction of the statute has been followed in our later cases, the latest being *State v. Teague,* Tenn., 645 S.W.2d 392 (1983). In *Teague* we said:

"Evidence is relevant to the punishment only if it is relevant to a statutory aggravating circumstance or to a mitigating factor raised by the defendant." 645 S.W.2d at 399.

During the sentencing phase of the trial the State, over the objection of the defendant, introduced evidence as follows:

  (1) Evidence that the defendant had been convicted in 1965 of the offense of "larceny from the person" and sentenced to a term in the penitentiary from three to ten years.

  (2) Evidence that in 1965 the defendant had been convicted of the offense of "attempt to commit a felony" and sentenced to a term in the penitentiary of one year and one day.

■ No evidence was offered to show that either of these convictions involved the use or threat of violence to the person. This Court held in *State v. Moore,* Tenn., 614 S.W.2d 348 (1981), that when the State seeks to rely upon convictions of what are essentially crimes against property in order to establish aggravating circumstances under subsection (i)(2) of this statute it must be shown that there was, in fact, either violence to another or the threat thereof, although this would not generally be required if the conviction were for rape, murder, or other crime which by definition involves the use or threat of violence to the person. We conclude, therefore, that the trial court erred in allowing evidence to be introduced of these two convictions, there being no evidence that either involved the use of violence or threat of violence to the person.

■ Even more serious error was committed by the trial court in permitting the State, over the objection of the defendant, to present evidence that an indictment was then pending against the defendant, charging aggravated assault with a .22 caliber pistol, in October, 1978, against one Honeycutt.

Evidence of this pending charge was produced through the testimony of the clerk of the court in which the indictment was pending. One need only read the statute, above quoted, to learn that it is only *convictions,* not mere accusations, of felonies involving the use or threat of violence to the person which qualify as an aggravating circumstance under the statute. Thus, it was clearly error for the trial court to permit evidence of this pending accusation. But, this error was further compounded when the trial court permitted, over the objection

of the defendant, the State to introduce, through the testimony of police officer Jerry Stout, the *ex parte* statements taken from the victim, Honeycutt, a statement taken from a witness George Mullins, a statement from witness Gene Burlinson taken by a different police officer, and a statement given by witness Burney Williams, all of which purported to detail the incidents upon which the pending accusation was based. Moreover, the defendant was given no indication that these statements would be introduced until the morning of the hearing at which they were introduced. Allowing the State to read these *ex parte* statements of alleged witnesses to the jury in this cause was flagrant error and must be considered to have been highly prejudicial to the defendant.

The introduction of such evidence cannot be justified upon the theory that it was relevant to rebut evidence of mitigating circumstances that might be produced by the defendant. This is necessarily true because the only evidence introduced by the defendant was a laboratory report of the alcoholic content of the decedent's blood at the time of the killing. None of the evidence which we conclude to have been improperly admitted was relevant to that fact. As we held in *Cozzolino, supra,* at page 768, "One cannot rebut a proposition that has not been advanced."

■ During the sentencing phase of his trial the State also introduced evidence that the defendant was convicted in 1965 of second degree murder for which he received a sentence of ten years' imprisonment. This evidence was proper as evidence of the aggravating circumstance set out in T.C.A., § 39–2–203(i)(2). Moreover, as we have hereinabove noted, it was part of the State's theory that the defendant murdered Junior Adams for the purpose of avoiding, interfering with or preventing the prosecution of the defendant for the assault upon Shirley Bell; therefore, it was permissible for the prosecution, as it did, to show that an indictment was pending against the defendant based upon the shooting of Shirley Bell.

■ The jury, in rendering its verdict of punishment of death, did find that aggravating circumstances (i)(2) and (i)(6), above quoted, did exist and justified the death penalty upon those grounds. Thus it is apparent that the sentence in this case could be supported in the record were it not for the introduction of the evidence which we have held to have been erroneously allowed before the jury. This raises the issue whether the error in the introduction of such evidence was so prejudicial as to require a reversal. In considering a like issue in *Teague, supra,* Mr. Justice Cooper, writing for the Court, stated:

"We have no certain way of knowing whether the jury would have sentenced appellant to death if they had not considered evidence that appellant had been arrested in 1978 on a serious felony charge. It does appear to us, however, that some prejudice, of necessity, resulted from the jury considering the warrant and the subsequent arrest of appellant. As heretofore noted in the guilt phase of the trial, the state introduced evidence tending to show that the motive for the killing of Teresa Teague was to keep her from testifying against appellant on a charge that he had murdered John Mark Edmonds. A co-conspirator named in the improperly admitted 1978 warrant was John Edmonds. The probability of prejudice resulting from the consideration of the improperly admitted evidence, in our opinion requires that the sentence of death be reversed and the cause be remanded to the trial court for a sentencing hearing." 645 S.W.2d at 399.

In our opinion, this reasoning applies with equal force to the case now before us and we find that the probability of prejudice from the introduction of the evidence hereinabove held to have been wrongfully allowed is so great as to require our reversal of the death sentence.

The defendant also challenges the constitutional validity of the death penalty as provided by the statutes, but, a majority of this Court has rejected such attacks in several other cases and continues to adhere to

that position. *See, State v. Dicks,* Tenn., 615 S.W.2d 126 (1981), *cert. denied* 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981). The author of this opinion, however, is of a contrary opinion as set out in his dissent in the *Dicks* case, 615 S.W.2d 132 (1981), and continues to adhere to that view.

Finally, the defendant contends that the trial court erred in failing to grant a new trial upon the ground of newly discovered evidence. We have examined this argument and have concluded that it is without merit.

The judgment of conviction is affirmed; the sentence of death is reversed and set aside and this cause is remanded to the trial court for further appropriate proceedings. Costs incident to this appeal are adjudged against the appellee; all other costs will be assessed by the trial court.

FONES, C.J., HARBISON, DROWOTA, JJ., and DAVIS, Special Justice, concur.