**STATE of Tennessee, Plaintiff–Appellee,**

v.

**Leonard Edward SMITH,
Defendant–Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Feb. 8, 1988.

On Rehearing Aug. 1, 1988.

J. Robert Boatright, Kingsport, Larry S. Weddington, Bristol, for defendant-appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

## OPINION

BROCK, Justice.

The defendant was convicted of murder in the first degree for the killing of Mrs. Novella Webb and has been sentenced to death by electrocution. In fixing the punishment at death by electrocution the jury found that the following aggravating circumstances had been established: (1) defendant was previously convicted of one or more felonies other than the present charge which involved the use or threat of violence to the person; and (2) this murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit robbery. The jury found no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances. Accordingly, the trial court entered the judgment of death by electrocution.

The pre-trial aspects of this case are somewhat unusual. Initially, the Grand Jury returned an indictment charging the defendant Smith along with co-defendants David Wayne Hartsock and Angela O'Quinn with murder in the first degree in the killing of John Pierce during the perpetration of a robbery of John Pierce and in a

second count charged the defendant Smith and co-defendant David Wayne Hartsock with murder in the first degree of Novella Webb during the perpetration of a robbery of Novella Webb.

On August 24, 1984, the defendants Smith and Hartsock were re-indicted for the murder in the first degree of Novella Webb during the perpetration of a robbery of Novella Webb and W.H. Webb. It was alleged that each of these offenses was committed on May 21, 1984.

The defendants filed pre-trial motions for suppression of the defendants' statement, for severance of the defendants for trial and for a change of venue, which motions were initially denied. Defense motions for severance of the offenses for trial and for an independent mental evaluation were granted. In due course the case came on for trial and on the first day of jury selection, January 7, 1985, the defendants' motion for a change of venue was renewed following the voir dire of a juror wherein she testified that several jurors had been discussing the fact that there were two killings involved. This motion was overruled by the trial court but on the third day of jury selection, January 11, 1985, after a hearing, the trial judge ordered a change of venue to Hamblen County, with the consent of the defendants, and then ruled on the State's late filed motion and severed the defendants for trial, severed the offenses for trial for co-defendant Hartsock, but reversed its earlier ruling and joined the offenses for trial for defendant Smith.

On March 18, 1985, the trial began in Hamblen County after the defendant's motion for continuance of the trial and for the appointment of local counsel to assist in selection of jurors was overruled. In the first phase of the bifurcated trial the defendant was found guilty of first degree murder in both the Webb and Pierce cases. At the conclusion of the sentencing phase of the trial, defendant Smith was sentenced to death by electrocution in the Webb case and sentenced to a consecutive life sentence in the Pierce case. Post-trial motions were overruled and this appeal resulted.

On the afternoon of May 21, 1984, a witness, Orville Malone, heard a sound similar to a firecracker in the vicinity of Malone's store and he observed an unidentified young man running out of the store. He then saw the storekeeper, Mr. John Pierce, appear on one knee in the doorway of the store and fire two shots. The fleeing male got into an automobile that was across the bridge behind the store and the automobile left the scene. Mr. John Pierce was then found, apparently dead, just inside the doorway of the store with a gun by his side. It was the opinion of the pathologist who performed the autopsy that Mr. Pierce's death was caused by a single gunshot wound to the abdomen.

Later that same afternoon, witness Robert Glover observed two young men drive up to Webb's Grocery in a "green looking" Pinto automobile. These two young men got out of the vehicle, one of them spoke to Mr. Glover, and then entered the store. A moment or two later Mr. Glover heard two loud noises from inside the store, and he walked to the entrance and opened the screen door. One of the individuals inside the store told him that he had better not come in if he knew what was good for him. Mr. Glover then ran to the road and stopped a passing motorist, Charles Webb. Mr. Glover testified that the two young men ran from the store to their vehicle. He identified the defendant Smith at trial as one of the two who had entered the store.

Witness Charles Webb testified that he observed two unidentified young men run from the store, "hop in a car and take off." Another witness, Tommy Trivette, travelling behind Charles Webb, testified that he observed two young men walking slowly out of the store and that they "appeared to be smiling." Witness Trivette identified the defendant Smith at trial as one of the two men he observed leaving the store. He further testified that when he entered the store Mr. Webb stated that he had been robbed.

Mrs. Novella Webb was found inside the store lying on the floor behind the counter. The pathologist who performed the autopsy

testified that her death was caused by a single gunshot wound that entered her face at the right nostril, at an upward angle of fifteen or twenty degrees, lodging inside the rear portion of the brain. He further testified that she was unconscious within seconds and that there was no chance of saving her life.

Gladys Sheets testified that on the evening of May 22, 1984, she drove the defendant Smith and the co-defendants Hartsock and O'Quinn to Johnson City and that they threw a gun out of the car. She testified that the defendant Smith gave O'Quinn some money and that she and O'Quinn purchased back packs, blankets, shoes and hats at a K–Mart store. Then they purchased food at a Giant Food Market and purchased gas and cigarettes at a service station with the money that the defendant had given her. They then drove to her sister-in-law's house in a rural section of Johnson County, Tennessee, where she left them.

Mike Gardner, the Sheriff of Sullivan County, testified that on May 21, 1984, he investigated a shooting at Malone's Grocery Store located on Highway 19E in Sullivan County. While he was there he received a call concerning another shooting at Webb's Grocery on Hickory Tree Road, also in Sullivan County. On May 22, 1984, the investigation of these shootings led to three suspects, the defendant Smith, David Hartsock and Angela O'Quinn. These three were arrested at daybreak on May 23, 1984, at a secluded house in Johnson County and were returned to Sullivan County.

Doctor Leland Blake, a clinical pathologist, testified that he performed an autopsy on the body of John Pierce and determined that the cause of death was a gunshot wound to the abdomen from which he removed a thirty-two caliber bullet. He also testified that he performed an autopsy on the body of Novella Webb and determined the cause of death to be a gunshot wound to her head. He also removed a thirty-two caliber bullet from her body.

Keith Carr, a detective employed by the Sullivan County Sheriff's Department, testified that he investigated the shooting at Malone's Grocery Store at approximately 5:30 p.m. on May 21, 1984. On his arrival he saw Mr. John Pierce lying in the doorway. While he was at Malone's Grocery Store he was dispatched to Webb's Grocery Store approximately five miles from Malone's. Upon arrival at the Webb's Grocery Store he observed a tremendous amount of disarray inside the store and blood stains behind and beside the counter. The body of Mrs. Webb had already been removed when he arrived. He testified that he observed an indentation in the wall directly behind the cash register.

Following the arrest of defendant Smith, Detective Carr interviewed him at the jail and obtained the following statement which he read to the jury, to wit:

I, Leonard Edward Smith, am giving this statement of my own free will and without any threats or promises being made to me. On Monday, May 21, 1984, I was with my girlfriend Angie O'Quinn and David Hartsock and we went and got some liquor and went to a road near the Sullivan–Carter County line. We parked and were just drinking and talking and smoked some joints. While we were on that road in my black Ford Pinto which I had painted black because it used to be orange, David said "Get out, I want to talk to you." He and I got out and walked a ways from the car where Angie couldn't hear us talking and David said, "I can get us a little bit of money down here at this store." He said, "It is the store down at the county line," and I asked him if it was Shorty Malone's and he said, "Yes." Angie and I drove David down there, and let him off a little ways from the store. I parked on the little paved road beside the store. David had a thirty-two caliber chrome plated pistol with him. The pistol was his pistol. I heard several shots fired and just a few seconds later David came running around the store. David jumped into the car and said, "Get the hell out of here, I had to shoot him." I figured it was Shorty because he ran the store. We drove out the road that goes behind the

side of Malone's Grocery, and it dead ends, and you can turn left to the Wautauga area or right back to Sullivan County. We turned onto the Wautauga Highway and drove to what is known as Mountain Road. I asked David if he shot the man, and he said that he shot him one time and the man pulled a gun and started shooting at him. I don't remember if he said what money he got. I drunk some more liquor, and made Angie get out of the car. I started driving and was just going to drive us out of the mountain. We came out at some store, and I turned left, and drove until I realized I was going to [sic] wrong way, and I pulled in at Webb's Store to turn. I stopped the car at Webb's and David jumped out, and I ran in the store behind him. David ran and jumped on the counter, and knocked the old man over and yelled to me, "Get that bitch" referring to an old woman at the end of the counter. I started towards her, and she started throwing things at me and started spraying paint on me. I fired one shot just to scare people, but the old woman just kept spraying orange paint and came towards me. I couldn't see because of the paint and I held the gun up and apparently the old lady was trying to get the gun away from me and it went off. We ran from the store when I fired the second shot. I didn't really know that I had shot her until we heard it later on the news. When we were in Webb's Store the old man was hollering, "Help me, help me," and hollering for his wife. The old woman never did say anything that I remember. I know that before we left the store, some man came up to the door, and I told him to get out of there. I didn't get any money from either store, and David didn't say if he did or not. David and I left Webb's and went back up towards Mountain Road, and picked Angie up. I told her we had to get out of there, and we drove down towards Underwood Park, and set the car on fire. David cut a hose next to the carburetor and set the car on fire. David and Angie and me took off on the trails, and really didn't know which way to go. We came

out at a house on Indiana Creek. It was the Johnson residence because my dad had sold them the house. We didn't go to the house until late last night, and Angie got Gladys Sheets to take us to the home where we were arrested this morning. I had never been to the house before but had been in the area. When Gladys drove up to Dennis Cove, she said she thought we did it. I had taken my shirt and wrapped my feet so I could walk and I think I left it in Gladys' car or at the house. Gladys had told us that Mrs. Webb, and the man at Malone's were both dead. We told Gladys that we didn't do it and she said, "If you didn't, you better keep the gun because the news said it was a thirty-eight" and she knew we had a thirty-two caliber. I told David to throw the gun out anyway because I knew we had done it. He threw it out as we went over a bridge, and we drove on up to the house. We stopped at a grocery store, and Angie and Gladys went in and got some food for us to take to the house. We fixed something to eat, went to sleep, but I felt like they knew where we were at. I had cut mine and David's hair with a pair of scissors Angie had in her pocketbook because I knew they would be looking for somebody with longer hair. This morning I heard a loud noise, and I knew we were caught then. I told Angie I was going out, and you come out too, so we won't get hurt. Somebody had yelled for us to come out, and David went out first. All I know is that everything didn't turn out the way it was supposed to, and it shouldn't have happened. I am sorry for what happened, because I know I am a thief, but I don't think of myself as a murderer. This is all I know to tell you about what happened.

Carr obtained a hair sample from defendant Smith and observed that his hair had been cut close and nearly shaved at the time of his arrest.

Robert Denny, an agent of the Tennessee Bureau of Investigation, testified that pursuant to information he had received he located a burned vehicle and an abandoned

campsite on Holston Camp Mountain in Sullivan County. He testified that in scraping the paint off the vehicle he found brown and orange layers of paint.

Deputy Sheriff Keith Elton testified that when he arrested the defendant Smith he removed an unspent thirty-two caliber cartridge and twenty-seven cents in change from the defendant's person.

John Young, an officer with the Sullivan County Sheriff's Department, testified that subsequent to the defendant's arrest he found a handgun at a railroad crossing located between Elizabethton and Johnson City. He removed six unspent cartridges from the gun.

Gladys Sheets, a friend of defendant Smith and Angela O'Quinn, testified that at about 7:00 p.m. on May 22, 1984, O'Quinn came to her home and said that the defendant wanted the witness to take him to Kathy's. The witness testified that she was scared because the police had been there earlier. She testified that David Hartsock came up and all three of them got in her car. The defendant came out of the woods and got into the back seat. The witness drove them along the back roads to Johnson City with the defendant giving her directions. When the witness told the defendant Smith he ought to get rid of the gun, he replied, "You're right," and threw it out on a railroad bridge. The witness testified that she had seen the same pistol a couple of weeks before. They proceeded to the K–Mart in Johnson City and the defendant gave O'Quinn some money. The witness and O'Quinn went inside and purchased some camping equipment. The defendant stayed in the car. They then drove to the Giant Food Market where the two women bought groceries. They then proceeded to a service station where the defendant gave the witness some money for gas and cigarettes. The group then proceeded to a dirt road in Johnson County where the witness let the defendant Smith, O'Quinn and Hartsock out with the items they had purchased. The witness testified that the hair of both the defendant and Hartsock was short when she saw them that day.

William Albrecht, a special agent with the F.B.I., and a firearms identification expert, testified that the bullet removed from John Pierce's body was fired from the gun which Officer Young found at the railroad crossing. He testified that the bullet removed from Novella Webb's body was a thirty-two caliber bullet but that it was so mutilated he could not determine the rifling characteristics. He testified that the pistol was in working condition when he examined it. He testified that the gun did not have a hair trigger and could not have been fired by merely dropping it on the floor.

Chester Blythe, a special agent with the F.B.I. and a microscopic analyst, testified that hair taken from the campsite on Holston Mountain in Sullivan County matched Hartsock's hair sample but did not match the defendant's sample.

John Riley, a special agent with the F.B.I., testified that the bullet recovered from Novella Webb, the six unspent cartridges found in the pistol, and the one unspent cartridge found in the defendant's pocket all originated from the same box of ammunition.

Robert Webb, a special agent with the F.B.I., testified that the pistol contained particles of paint consistent with a can of spray paint found at the shooting scene in Webb's Grocery.

Katy Mahoney, the daughter of Worley and Novella Webb, testified that she determined that seventy-five dollars was missing from the store after the robbery and killing.

The defendant offered no evidence.

In the sentencing phase of the trial the State produced evidence showing that the defendant Smith had been previously convicted of robbery in Carter County, Tennessee in two separate cases, one on October 13, 1980, and the other on February 21, 1985. The defendant offered no evidence.

■ The defendant contends that his confession was coerced from him and was given involuntarily and thus in violation of his constitutional right of due process. Sheriff Mike Gardner and Detective Keith Carr testified in considerable detail con-

cerning the circumstances surrounding the defendant's confession and the trial judge, after considering the evidence offered by the State and by the defendant upon this issue, resolved the issue in favor of the State and admitted the confession into evidence. This Court is bound by that determination if there be any material evidence to support it. *State v. Pritchett,* Tenn., 621 S.W.2d 127 (1981); *State v. Chandler,* Tenn., 547 S.W.2d 918, 922–23 (1977). We find ample evidence in this record to support the finding of the trial court that the defendant's confession was given voluntarily.

Thus, Sheriff Mike Gardner testified at a hearing on the motion to suppress that on May 23, 1984, the defendant was arrested outside a house in a remote area of Johnson County, pursuant to an outstanding arrest warrant. Defendant was seized when he and two companions emerged from the house, handcuffed, independently advised of his rights, and placed in a patrol car. The defendant made no statement to the sheriff or any other officer before being advised of his rights. Upon arriving at the Sullivan County Jail, the defendant was re-advised of his rights. After the defendant gave a written statement, Sheriff Gardner asked him if he had read a printed form advising him of his rights under the *Miranda* decision and, if so, whether he had made the statement which he had signed and whether or not it was an accurate statement; to all of these inquiries the defendant answered affirmatively. Sheriff Gardner denied that he or any of his deputies physically or verbally mistreated the defendant, as he alleges.

Detective Keith Carr testified that before the interrogation of the defendant at the jail, the defendant was advised of his *Miranda* rights and stated that he understood them. He stated his willingness to waive his rights and signed a written form of waiver at 9:20 a.m. After Carr wrote down defendant's statement, the defendant read it aloud, verified its accuracy and initialed each page and signed it. During the course of the day the defendant was interviewed about other matters and was re-advised of his rights each time. At 10:55 p.m.

the defendant refused to answer any questions and at that time all questioning ceased. Detective Carr testified that the defendant was neither physically nor verbally abused but was given coffee and cigarettes, but did not ask for food. Detective Carr testified that the defendant complained to him that his back was hurting because an arresting officer had put a gun to his back, whereupon Carr examined defendant's back and saw a red spot but no laceration. Defendant also complained about paralysis of his right hand but Detective Carr, who was also a qualified emergency medical technician, saw the defendant sign the statement with his right hand without difficulty and saw no swelling or bruising. The defendant did not ask to see a physician, or a nurse, for medical treatment. Carr testified that the defendant was alert and gave immediate responses to all questions and that the defendant did not ask for an attorney.

Gerald Meredith, a nurse employed by the sheriff's department, testified that he examined the defendant approximately fifteen minutes after the defendant arrived at the jail and observed only two small areas on the defendant's back and testified that these appeared to be a couple of days old.

Our conclusion is that the evidence just outlined amply supported the conclusion of the trial court that the defendant's confession was voluntarily given and was admissible in evidence.

■ The defendant contends that the trial court erred in excluding prospective juror Mr. Wiley Williams for cause based upon his views regarding capital punishment. Defendant urges that the dismissal of prospective juror Williams denied him the right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the Constitution of the United States. He further contends that the "death-qualification" of prospective jurors necessarily results in a conviction-prone jury and therefore violates the Sixth and Fourteenth Amendments. Our review of the record and applicable law convinces us that no error was committed.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777. It was the opinion of the Court that a jury thus selected would not meet the test of impartiality required by the Sixth Amendment but would be a jury "uncommonly willing to condemn a man to die." 391 U.S. at 521, 88 S.Ct. at 1776. More recently, the Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) clarified its prior holding in *Witherspoon*. The Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his views respecting capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852.

In the case at bar, prospective juror Williams stated on voir dire that under no circumstances could he vote for the death penalty. It is clear from the juror's answers to questions that his views on capital punishment would have prevented or substantially impaired his performance as a juror in accordance with his instructions and his oath. Accordingly, the trial court did not err in granting the State's motion to challenge juror Williams for cause. We find no error.

The defendant relies upon *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985) (en banc) to argue that the "death-qualification" of jurors results in a conviction-prone jury, thereby depriving the defendant of an impartial jury. The United States Supreme Court, however, granted certiorari in *Grigsby* and reversed the Eighth Circuit, rejecting the argument the defendant now makes. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This Court in recent opinions has also considered and rejected this claim. *State v.*

*Bobo*, Tenn., 727 S.W.2d 945, 949 (1987); *State v. Harbison*, Tenn., 704 S.W.2d 314, 318 (1986). Therefore, we must deny the defendant's insistence on this issue.

■ During the sentencing phase of this trial, the state in attempting to establish a prior felony conviction involving the use or threat of violence, as an aggravating circumstance, was allowed to read to the jury an indictment charging armed robbery although the conviction under that indictment was for simple robbery. The defendant cites this as error. It is true that we have held that only convictions, not mere accusations, of felonies involving the use or threat of violence to the person may qualify as an aggravating circumstance under T.C.A. § 39–2–203(i)(2), and that the admission of a pending accusation is error. *State v. Adkins*, Tenn., 653 S.W.2d 708, 715 (1983). However, in the case at bar, no pending indictments were admitted in lieu of convictions. Here the indictments, one for armed robbery and one for simple robbery, and the resultant convictions for simple robbery on those indictments were presented. In the instant case the indictments, as well as the convictions, were relevant to show the underlying facts of the offenses in order to establish that each offense involved the use or threat of violence to the person. Both indictments charge that the defendant committed the offenses "forcibly". Considering that the corresponding convictions upon these indictments were admitted into evidence we find no error in the action of the trial court.

■ During its deliberations at the sentencing phase of the trial, the jury requested that the trial court define the word "mitigating". The trial court complied by instructing the jury in writing as follows:

Mitigation is defined for you as that which tends to soften, temper, or make less harsh or severe. Thus mitigating circumstances surrounding a criminal offense are those circumstances which tend to lessen the apparent badness of the particular crime in question or the apparent badness of the particular defendant. You will consider this additional instruc-

tion in conjunction with all other instructions and, as previously stated, you should not single out one or more instruction but should consider each one in light of and in harmony with the others.

The defendant contends that this additional instruction was error because it limited and restricted the jury in its deliberation as to what might be favorable to the defendant. This contention of the defendant overlooks the fact that elsewhere in its original charge the trial court fully and clearly instructed the jury to consider mitigating circumstances as set out in T.C.A. § 39–2–203(j) and also included this further instruction: "Any other factor you find to be a mitigating circumstance, whether proven in the evidence of the State or the defendant or whether in either the trial on the issue of guilt or innocence or the sentencing hearing."

We find no error. Apparently the court would not have been in error had it decided to deny the request for additional instructions respecting the term "mitigating". *State v. Groseclose*, Tenn., 615 S.W.2d 142, 147–48 (1981). But it clearly did not err in giving this instruction upon the jury's request. *Leach v. State*, Tenn.Crim.App., 552 S.W.2d 407, 408 (1977). The additional instruction as given, when considered with all of the other instructions respecting mitigating circumstances, did not have the effect of limiting or restricting the jury's consideration of any mitigating circumstance. The definition of "mitigating" given by the trial judge comports substantially with that given in the *American Heritage Dictionary Of The English Language:* "To moderate (a quality or condition) in force or intensity; alleviate ... to become milder."

We hold that the court committed no error in defining "mitigating" as he did.

■ The State's witness, Trivette, testified that he observed the defendant and his companion "nonchalantly walk out" of Webb's Grocery and get into their car and that "they appeared to be smiling to me, like they had just come out from getting a Coke or candy bar or something." Two other State's witnesses, Glover and Webb, both testified that the defendant and his companion *ran* from the store, thus, contradicting Trivette on that point. Defendant argues that Trivette's testimony in this regard was inadmissible and that reversible error was committed in permitting it to be admitted into evidence. He argues that Trivette's testimony, speculating that defendant and his companion "appeared to be smiling," was intended to prejudice the jury against the defendant and was so prejudicial as to outweigh any probative value of that testimony. It would have been the better course for the trial court to have excluded this testimony, but we are satisfied that the error, if any, in allowing its admission was harmless beyond a reasonable doubt when considered along with all of the evidence in the record. As has been said many times, a defendant is not entitled to a perfect trial but only to a fair trial.

■ Next, the defendant contends that error was committed in permitting the admission into evidence of a photograph of an indentation in the wall of Webb's Grocery, the theory of the State being that it was made by a gunshot fired by the defendant in the course of the robbery on this occasion. As the defendant himself argues in his brief, there was no evidentiary link connecting the indentation in the wall to one of the shots fired by the defendant and his confederate. We, therefore, fail to see that any prejudice could have resulted from admission of this photograph. If such admission was error, it was harmless beyond a reasonable doubt.

■ On direct examination, the State's witness, Ray Lambert, was asked about the defendant's residence prior to the murders in the instant case. When Lambert stated that the defendant and Angela O'Quinn had been living in the woods in a tent or in defendant's car, the following colloquy occurred:

Prosecutor: Well, let's see, prior to the time that the murders occurred, about how long had they been living out in the woods in a tent or out of his car?

Witness: About ever since he got out of jail.

The Court: The jury will disregard that. That's ...

Prosecutor: I am asking for a period of time in months and days.

The Court: That has nothing to do with this case. The jury will disregard that, give that no weight whatsoever. Go ahead.

At the conclusion of this witness's testimony, the defendant moved for a mistrial on the ground that the quoted colloquy constituted reversible error. The trial court denied the motion and we affirm that denial. The witness's answer was responsive to the question asked and there is no indication that the State intended or anticipated that the witness would mention that the defendant had been in jail. Moreover, the trial court immediately instructed the jury to disregard that statement and pointed out to the jury that the statement had "nothing to do with this case." In our view, this was a proper exercise of judicial discretion in such a situation and resulted in no prejudicial error to the defendant.

■ After the trial court had ordered a change of venue from Sullivan County to Hamblen County, the defendant moved the court for the appointment of additional defense counsel from Hamblen County to assist in the selection of a jury. The trial court denied that motion and the defendant now asserts that this was error. Defendant's counsel, both of whom are from Sullivan County, complain that they "were completely unfamiliar with the geo-economic, social, moral, and religious make-up of the jury panel in Hamblen County." That may be true but it falls far short of showing any necessity for the appointment of additional counsel resident in Hamblen County. There is no showing whatsoever that defendant's counsel were incompetent to select a fair and impartial jury from Hamblen County. This issue is overruled.

■ The defendant insists that the trial court committed reversible error in denying his motion to sever the offenses, the Pierce murder and the Webb murder, for trial. The defendant argues that he was entitled to the severance under the terms of Tennessee Rules of Criminal Procedure, Rule 14(b)(1) which provides:

If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

He argues that there was no common scheme or plan involved and that evidence of one of these homicides was not admissible on the trial of the other.

The State urges that the court was correct in denying the severance on the ground that there was a common scheme or plan within the meaning of Rule 14(b)(1) and that the evidence of the Pierce homicide was admissible upon trial of the Webb homicide upon the issue of whether or not Mrs. Webb was killed during the performance of a robbery of her store; that a conviction of murder in the first degree in the Webb case was dependent upon the State's establishing that Mrs. Webb was killed by the defendant during his performance of an armed robbery, since the offense charged in the indictment was felony murder, as distinguished from the so-called "common law" murder in which the State must establish deliberation and premeditation.

The trial judge conducted a pre-trial hearing on defendant's motion for severance of offenses and at the conclusion of the hearing determined that the severance would not be allowed because he found "the question of intent in each of the cases was unclear unless the defendant's statement was introduced unredacted." The court's reference to "the defendant's statement" was a reference to a confession made by the defendant following his arrest in which he discussed both the Pierce and the Webb killings. That confession has been hereinabove set out in toto. Obviously, the trial judge concluded that as evidenced by his confession, the defendant's admitted intent to obtain money by robbery in the Pierce case and his action with regard to the Pierce killing furnished a basis for an inference that he intended robbery

when he entered the Webb Grocery approximately forty-five minutes later and five miles distant from the Pierce killing, thus justifying his denial of a severance under Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure.

In some of our recent cases we have delineated the rules and policies involved in determining whether evidence that the defendant has committed a wholly independent crime from that for which he is charged is admissible in the case on trial. *State v. Parton,* Tenn., 694 S.W.2d 299, 302–03 (1985); *State v. Burchfield,* Tenn., 664 S.W.2d 284 (1984); *Bunch v. State,* Tenn., 605 S.W.2d 227, 229–30 (1980).

Applying to this case the principles stated in the cases cited, we hold that evidence of the Pierce robbery and murder should not be admissible in the case on trial, the Webb robbery and murder, for two reasons: (1) evidence of the first robbery and murder was not relevant to any issue on trial in the Webb murder; and (2) even if it had some remote relevance to the question of whether or not the defendant entered the Webb grocery with intent to commit robbery, as found by the trial judge, its probative value as such evidence is far outweighed by its prejudicial effect upon the defendant in the Webb case. As we stated in *Bunch* and reaffirmed in *Parton,* even if the proffered evidence of another crime meets the relevance test, it is nevertheless inadmissible if its prejudicial effect upon the defendant in the case on trial outweighs its probative value as evidence upon some issue in the trial. *Bunch v. State, supra* at 229; *State v. Parton, supra* at 303. The record does not support the assertion of the trial judge that "the question of intent in each of the cases was unclear unless the defendant's statement was introduced unredacted." On the contrary, the defendant's confession could be easily redacted by deleting all references therein to the robbery and killing of Mr. Pierce. Thus, contrary to the insistence of the State, even after the redaction, the record contains evidence that the defendant

entered the Webb Grocery with intent to commit robbery.

We think it clear, as insisted by the defendant, that evidence of the defendant's involvement in the Pierce case necessarily affected the jury's deliberation concerning punishment in the Webb case.[1] As a practical matter, making known to the jury the defendant's involvement in the Pierce case and his punishment in that case effectively eliminated the option of life imprisonment as a sentence for defendant in the Webb case. It opened the door for the State's attorney to argue in the sentencing phase of the Webb case that "to give life, a punishment of life, in this second killing is the equivalent of giving no punishment at all." We think that the prejudice to the defendant is obvious and the defendant's punishment in the Webb case should have been determined without regard to the Pierce case or the punishment to which the defendant was sentenced in that case. The only way to insure that the defendant's punishment in the Webb case would be determined on the merits of that case and without regard to the Pierce case was for the trial judge to have granted the motion for severance of the two offenses. In denying that severance, the trial judge committed reversible error.

▮ Moreover, we are of the opinion that the trial court erred when it failed to give a curative instruction at the request of the defendant with respect to the statement of the district attorney in his closing argument that "to give life, a punishment of life, in this second killing is the equivalent of giving no punishment at all." This statement by the district attorney was highly prejudicial and untrue and probably weighed heavily with the jury since they had been told by the trial judge that they would be instructed to return a life sentence for the defendant in the Pierce case, thus making it plausible for the jury to conclude that another life sentence for the

---

1. The State did not seek the death penalty for Smith in the Pierce case, and so announced at the conclusion of the guilt phase. The court directed a verdict of life imprisonment in that case.

Webb case would be "like no punishment at all."

■ Next, the defendant insists that the imposition of the death penalty for a felony murder constituted cruel and inhuman punishment. He argues that the "underlying felony", which in this case is armed robbery, which must be shown in order to render the killing first degree murder, cannot also be used or relied upon by the State as constituting one of the aggravating circumstances that justifies the death penalty.

Next the defendant argues that Tennessee's death penalty procedure whereby the jury, in a felony murder case, is permitted to find that the underlying felony, in this case armed robbery, amounts to an aggravating circumstance justifying the infliction of the death penalty is in violation of the cruel and unusual punishment clauses of both the State and Federal Constitutions.

This Court is aware of the fact that in *Collins v. Lockhart*, 754 F.2d 258 (8th Cir. 1985), the U.S. Court of Appeals found unconstitutional the Arkansas capital sentencing scheme which provided an aggravating circumstance that merely repeated an element of the underlying crime. That court held that the Arkansas provision was constitutionally infirm because it failed "to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime," thereby running afoul of the court's concern expressed in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *Collins, supra* at 264. *See also Glidewell v. State*, Okl.Crim., 663 P.2d 738 (1983).

Of course other courts, including this one, have decided this issue to the contrary. *State v. King*, Tenn., 694 S.W.2d 941, 946 (1985); *State v. Pritchett*, Tenn., 621 S.W.2d 127, 140–41 (1981). This precise question, however, was before the Supreme Court of the United States in *Lowenfield v. Phelps*, — U.S. —, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), *cert. granted* — U.S. —, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987). There the Court upheld the position that

we have taken herein and in *Pritchett* and *King, supra,* that use of the underlying felony, in this case armed robbery, as an aggravating circumstance upon which the jury may base a death penalty is constitutionally permissible.

We have considered every other allegation of error made by the defendant and find that they are without merit. Justice Brock, however, continues to adhere to his dissent in *State v. Dicks*, Tenn., 615 S.W.2d 126 (1981) wherein he stated his view that the death penalty in all circumstances is a cruel and unusual punishment and thus unconstitutional. The majority of the Court continues to adhere to its view that the death penalty statutes in this State are constitutional.

For the reasons hereinabove set out, the judgment and sentence imposed by the trial court in the Webb case is reversed, vacated and set aside and this cause is remanded to the trial court for a new trial. No error has been asserted and none has been considered by the court respecting the Pierce case.

## OPINION ON PETITION FOR REHEARING

In this case appellant was found guilty of murder in the first degree in connection with the shooting of Mr. John Pierce on the afternoon of May 21, 1984. Although the death penalty had been initially requested by the State, upon the return of a guilty verdict by the jury in the Pierce case, the State announced that it would not seek the death penalty. A life sentence was imposed in that case.

The defendant was also tried and convicted at the same time of the murder of Mrs. Novella Webb. This homicide occurred on the same date and a short time after the murder of Mr. Pierce. Appellant was found guilty of the murder of Mrs. Webb and was sentenced to death.

In its previous opinion this Court found that the State had unfairly argued for the death penalty in the Webb case after having waived the death penalty in the Pierce case. The Court held that there should

have been a severance of the two offenses, and it reversed the Webb case for a new trial as to both guilt and sentencing.

Both the State and the appellant have filed petitions for rehearing because in its previous opinion the Court did not deal with the appeal of the Pierce case. It was not clear to the Court from the brief of counsel that any appeal was being taken to this Court in the Pierce case.

 Appellant cites T.C.A. § 39–2–205 as authority for this Court to assume jurisdiction over both cases. That statute provides:

> If the defendant has been convicted of other crimes at the same trial where the death sentence is imposed, the Tennessee Supreme Court shall have authority to review by direct appeal such other crimes if appealed by the defendant with the conviction of first-degree murder and sentence of death.

Ordinarily that provision of the statute has been invoked when in connection with the murder trial the accused is convicted of some separate offense, such as the underlying felony in a felony-murder case.

Assuming, however, that it could be applied in the case where a separate life sentence has been imposed for a separate homicide, at the request of appellant we have reviewed the record with respect to the Pierce case. Even though error was found in joining these offenses, we do not believe that the error affected the result in the Pierce case sufficiently to warrant a retrial in that case.

Because the death penalty was given in the Webb case, the Court determined that a retrial of that case was necessary, largely because of the way in which the State attempted to argue in the Webb case that another life sentence would be no punishment to appellant in view of his conviction in the Pierce case.

It was our conclusion in the original opinion that the Webb case should be retried in its entirety, both as to guilt and the sentence, with evidence of the Pierce homicide excluded (except, of course, insofar as it might be made relevant or admissible through the defendant's proof or in some other manner and except at the retrial his prior conviction of murder in the Pierce case might be used as an aggravating circumstance for purposes of sentencing).

In our opinion any error in the Pierce case in the admission of evidence concerning the Webb homicide did not and could not have affected the guilt trial sufficiently to warrant a retrial of the Pierce charges.

In the original opinion we found no other reversible error, and accordingly we affirm the conviction and the sentence of life imprisonment imposed in the Pierce case but remand the Webb case for a complete retrial as provided in the original opinion.

Costs incident to the petition to rehear will be taxed equally to the parties.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.