IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 9, 2002 Session

## STATE OF TENNESSEE v. JAMES HENDERSON DELLINGER AND GARY WAYNE SUTTON

**Appeal from the Court of Criminal Appeals**
**Circuit Court for Blount County**
**No. C-6669 and C-6670      D. Kelly Thomas, Jr., Judge**

---

**No. E1997-00196-SC-DDT-DD - Filed May 7, 2002**

---

James Henderson Dellinger and Gary Wayne Sutton were convicted of first degree premeditated murder in the death of Tommy Mayford Griffin. Dellinger and Sutton were both sentenced to death, and the Court of Criminal Appeals affirmed their convictions and sentences. We entered an order designating the following issues for oral argument:[1]  1) whether the indictments violate the United States Constitution as construed in Apprendi v. New Jersey, 530 U.S. 466 (2000); 2) whether the trial court erred in refusing to grant the defendants a severance or to grant separate juries for each defendant; 3) whether the trial court erred in dismissing the jury selection expert previously granted the defendants; 4) whether the trial court erred in refusing to suppress evidence seized from Dellinger's residence under a search warrant; 5) whether the evidence supports the jury's finding of aggravating circumstance (i)(2); 6) whether the trial court erred in failing to instruct the jury at sentencing that the identity of the defendants in prior convictions must be proven beyond a reasonable doubt; 7) whether the trial court erred in refusing to charge the jury as a mitigating factor that the defendants are human beings; 8) whether the trial court erred in refusing to answer the jury's question about the manner of serving life sentences; and 9) whether the sentences of death are excessive or disproportionate under Tenn. Code Ann. § 39-13-206(c)(1)(D). Having carefully reviewed these issues and the remainder of the issues raised by Dellinger and Sutton, we find no merit to their arguments.[2]  Accordingly, we affirm the Court of Criminal Appeals in all respects.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed.**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

[2] We note that Dellinger and Sutton have incorporated by reference sections of their Court of Criminal Appeals brief. We take this opportunity to discourage this practice among parties before this Court. See State v. Sledge, 15 S.W.3d 93, 96 n.2 (Tenn. 2000).

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, and WILLIAM M. BARKER, JJ, joined. ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

F.D. Gibson, Maryville, Tennessee, and John M. Goergen, McMinnville, Tennessee, for the appellant, Gary Wayne Sutton.

Charles Deas and Eugene Dixon, Maryville, Tennessee, for the appellant, James Henderson Dellinger.

Michael E. Moore, Solicitor General; and Jennifer L. Smith and Kenneth W. Rucker, Assistant Attorneys General, for the appellee, State of Tennessee.

Paula R. Voss, Knoxville, Tennessee for the amicus curiae, Tennessee Association of Criminal Defense Lawyers.

Marjorie A. Bristol, Assistant Post-Conviction Defender, for the amicus curiae, Office of the Post-Conviction Defender.

**OPINION**

FACTUAL BACKGROUND

On the afternoon of February 21, 1992, Dellinger, Sutton, and Griffin spent several hours at Howie's Hideaway Lounge (Howie's) on Highway 321 in Maryville, Tennessee. The three men drank beer and played pool until approximately 7:00 p.m., when they left the bar in a dark-blue Camaro. Witnesses testified that there was no evidence of hostility among the men while they were in the bar.

Around 7:00 p.m. Cynthia and Kenneth Walker were traveling north on Alcoa Highway near the Hunt Road exit. They observed three men who appeared to be fighting in a dark-colored Camaro on the side of the road. Two of the men were standing outside of the car attempting to forcibly remove the third man from the back seat. Kenneth Walker used his portable radio to report the incident to the dispatcher for Rural Metro Blount County Ambulance.

Sharon Davis, who was also driving north on Alcoa Highway around the same time, observed a shirtless and shoeless man stumbling down the side of the road near the Hunt Road exit. When Davis passed the same area about thirty or forty minutes later, she saw two men standing outside of a dark-colored Camaro on the side of the road. They appeared to be looking for something.

At 7:11 p.m. Sandra Hicks, a dispatcher for Blount County 911, received a complaint about an altercation involving three men in a dark Camaro at the intersection of Alcoa Highway and Hunt Road. Officer Steve Brooks with the Alcoa Police Department was dispatched to the scene. While

making an unrelated traffic stop, Officer Brooks noticed a vehicle with flashing headlights parked on the side of Hunt Road. The officer sent his backup, Officer Drew Roberts, to investigate. Officer Roberts found two men, not Dellinger and Sutton, standing next to a pickup truck. A shirtless man sitting on the bed of the truck identified himself as Griffin. Griffin told the officer that his friends had put him out of a car. Griffin would not identify his friends or tell the officer what had happened. Officer Roberts arrested Griffin for public intoxication. Griffin was booked at the Blount County jail at 7:40 p.m. Dellinger arrived about forty-five minutes to an hour later to ask about Griffin's release. Sergeant Ray Herron explained to Dellinger that department policy required a minimum four-hour detention for public intoxication and advised him to come back at 10:30 or 11:00 p.m.

Alvin Henry was a resident of Bluff Heights Road, where Dellinger and Griffin both lived. At approximately 9:00 p.m., Henry looked out of his trailer window and saw Dellinger's white Dodge pickup truck. Henry saw someone enter the passenger side of the truck. The truck drove up the road and pulled into Dellinger's driveway. Henry then noticed fire shooting from Griffin's trailer down the road. Henry's wife reported the fire to the 911 operator at 9:02 p.m. Arson investigator Gary Clabo concluded that the fire was set intentionally with the use of a liquid-type accelerant and an open flame such as a match, candle, or cigarette lighter.

Jennifer Branam, Griffin's niece, ran to Dellinger's trailer when she learned that Griffin's trailer was on fire. Just as Dellinger's wife was telling Jennifer that Dellinger was not home, Dellinger and Sutton walked down the hall from the living room. The two men were still wearing their jackets, and their pants were wet up to the knees. Jennifer asked them if Griffin was in his burning trailer, and Sutton told her that Griffin was in Blount County with a girl. When Jennifer asked the men to accompany her to the trailer, Dellinger responded that they were already in enough trouble.

After returning home, Jennifer looked out the window and saw Dellinger remove an object wrapped in a sheet from his truck and place it into the back of his wife's Oldsmobile. Jennifer testified that the object resembled a shotgun. Herman Lewis, a relative of Jennifer, also observed Dellinger moving an object from his truck to his wife's car shortly after 10:00 p.m. Dellinger and Sutton then left in the Oldsmobile.

At around 11:25 p.m. Dellinger and Sutton returned to the Blount County jail. Dellinger paid a cash bond for Griffin. Officers in the jail lobby overheard one of the defendants tell Griffin that they needed to get him back to Sevier County. At 11:55 p.m. Jason McDonald and his mother, Brenda McKeehan, heard two gunshots fired from an area on the Little River in Blount County called the Blue Hole. The Blue Hole is approximately five hundred yards down the hill from McDonald's residence.

The next morning, February 22, Jennifer Branam saw Dellinger leave his trailer, remove the object he had placed in his wife's car the night before, and place the object under his trailer.

Around noon on February 22, Connie Branam, Jennifer's mother and Griffin's sister, informed her daughter Sandy of her intent to go to Blount County to look for Griffin. At about 2:00 p.m., Connie Branam went to Jerry Sullivan's grocery store in Townsend asking if anyone had seen her brother. Sullivan then saw Branam speaking with two men in a white Dodge pickup truck in the grocery store parking lot.

Later that afternoon, Connie Branam accompanied Dellinger and Sutton to Howie's. Branam told Jamie Carr, who worked as the afternoon bartender at Howie's, that she was looking for her brother. Responding to Dellinger's questioning, Carr repeatedly told them that she remembered Dellinger, Sutton, and Griffin from the night before. When Dellinger asked if Carr remembered with whom Griffin left, she responded that they were still at the bar when her shift ended. Dellinger told Carr that they last saw Griffin with a short, dark-haired, ugly woman. When Carr's shift ended at 5:00 p.m. on February 22, Branam, Dellinger, and Sutton were still drinking beer in the bar.

Terry Lilly Newman worked the shift following Carr's at Howie's. When she approached Branam, Dellinger, and Sutton to ask if they needed anything, Dellinger asked Newman if she remembered them from the night before. Newman responded that she recalled seeing Dellinger and Sutton with another man drinking beer and playing pool. Branam explained that she was looking for her brother and asked with whom he had left the bar. Newman became confused because she knew that Griffin had left with Dellinger and Sutton. Dellinger asked Newman if she remembered them returning to Howie's after they bailed Griffin out of jail, but Newman knew that the three had not returned to Howie's because she had worked until closing. After unsuccessfully attempting to convince Newman to join them in their search for Griffin, Sutton asked Newman if she was married. When Newman responded that she was married, Sutton stated, "[W]ell, your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." Dellinger, Sutton, and Branam left Howie's around 6:30 p.m.

About 8:00 p.m. that night, James and Barbara Gordon observed a fire in the woods near the Clear Fork area of Sevier County. The following morning, Barbara Gordon watched a white truck occupied by two men leave the woods and head toward the main road. She testified that the truck was traveling rapidly and that it came from the general area where they had observed the fire the night before.

On Monday, February 24, around 3:30 p.m. Griffin's body was discovered lying face-down on a bank at the Blue Hole. He had been shot in the back of the neck at the base of the skull with a shotgun. Two 12-gauge shotgun shell casings and beer cans were found near the body. The shotgun shells were fired from the same gun that fired shells later found in Dellinger's yard. Forensic pathologist Dr. Charles Harlan opined that Griffin had died between 6:00 p.m. on February 21 and 8:00 a.m. on February 22. Dr. Eric Ellington with the Blount County Medical Examiner's Office conducted the autopsy on Griffin's body. He concluded that the cause of death was the destruction of the brain stem from the shotgun wound. Ellington retrieved two metal pellets and two pieces of shotgun wadding from Griffin's brain. The pellets were consistent with pellets loaded in the 12-gauge "00" buckshot casings found near Griffin's body.

On Friday, February 28, Connie Branam's body was discovered in her burned vehicle in the wooded area where the Gordons had observed the fire on February 22. Arson investigator Gary Clabo determined that the fire had been set by human hands, started by an outside ignition source with the use of an accelerant. Branam's body was so badly burned that forensic anthropologist Dr. William Bass was unable to determine the cause or time of death. Dental records were necessary to identify the body. Investigators discovered a rifle shell in the burned vehicle that had been fired from the .303 rifle later found in Dellinger's trailer.

Based upon the above evidence, the jury convicted Dellinger and Sutton of the first degree premeditated murder of Griffin. At the penalty stage, the State presented evidence that Dellinger and Sutton were previously convicted of first degree premeditated murder in Sevier County in 1993.[3] The State also presented proof that Sutton was convicted of aggravated assault in Cobb County, Georgia in 1983.

The defense presented mitigation witnesses, including family members, friends, acquaintances, and clinical psychologists. Dellinger presented proof that he was raised in a large family with eight children. His parents were loving but were harsh disciplinarians, and his family was very poor. Dellinger left school when he was ten years old and never learned to read or write. He became a carpenter, and testimony showed that he was a good employee until 1990 when he sustained a back injury that forced him to quit working. Dellinger has four children and two stepchildren from his two marriages. Two of his children had died tragically–an eighteen-year-old daughter died in a car accident, and a fifteen-month-old son died when a stove fell on him. Dellinger presented evidence that he is a non-violent, religious, helpful, and kind-hearted man. He had been a well-behaved prisoner and had prevented another prisoner from committing suicide. Clinical psychologist Dr. Peter Young testified that Dellinger has an IQ between 72 and 83 and has borderline personality disorder. He related that due to a lack of family nurturing Dellinger is distrustful of others. Young testified that although Dellinger is not violent he is capable of "flaring up" when drunk and angry. Young opined that Dellinger would do well in a structured prison environment.

Sutton presented evidence showing that he had been a good employee and a well-behaved prisoner. His parents divorced when he was a toddler, and he dropped out of school in the eighth grade. Sutton has one daughter, and witnesses testified that he gets along well with children. Witnesses also testified that he is a generous man and a good family man who provided assistance to his sister-in-law and her son when his sister-in-law had surgery. He also saved his niece's life by rescuing her from a fire. Sutton is a good artist. He draws well and makes woodwork items as gifts and to earn money. Sutton's brother testified that the aggravated assault conviction was based upon an incident in which Sutton was merely present when his brother fired a gun into a car and the bullet bounced into a mobile home and struck a woman in the leg.

---

[3]These convictions were for the murder of Connie Branam.

Clinical psychologist Dr. Eric S. Engum testified that Sutton's IQ is between 77 and 83. His intellect, social judgment, abstract reasoning, and vocabulary are limited. Engum related that Sutton had suffered undiagnosed learning disabilities. Sutton's father was an alcoholic, and Sutton began abusing alcohol at the age of twelve. Sutton suffered mental and physical abuse due to the conflict between his parents and learned distrust of others at an early age. Engum stated that Sutton self-anaesthetized through the use of alcohol and marijuana. Engum diagnosed Sutton with a depressive disorder and a mixed personality disorder with passive/aggressive and anti-social features. Engum opined that prison would be a good environment for Sutton.

The jury returned its verdict, finding the (i)(2) aggravating circumstance, that the defendants were previously convicted of a felony whose statutory elements involve the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2). The jury found that this aggravating factor outweighed any mitigating circumstances and sentenced Dellinger and Sutton to death.

## CONSTITUTIONALITY OF THE INDICTMENTS

Dellinger and Sutton challenge the constitutionality of their indictments based upon the recent United States Supreme Court decisions in Jones v. United States, 526 U.S. 227 (1999), and Apprendi v. New Jersey, 530 U.S. 466 (2000). In Jones, the Court construed a federal statute and noted that the constitutional guarantees of due process, notice, and trial by jury require that any fact, *other than a previous conviction*, used to enhance a sentence *above the statutory maximum* must be: 1) charged in the indictment, 2) submitted to the jury, and 3) proven beyond a reasonable doubt. Jones, 526 U.S. at 243, n.6. In Apprendi, the Court held that the Fourteenth Amendment extends these requirements to cases involving state statutes. Apprendi, 530 U.S. at 476. Dellinger and Sutton maintain that the indictments in this case failed to comply with the Apprendi requirements because the indictments did not contain any facts concerning the Branam murder, which was used as an aggravating factor during sentencing.

The defendants' argument fails for multiple reasons:

1. The specific aggravating factor used to impose the death penalty in this case was a prior conviction. The Apprendi holding applies to enhancement factors other than prior convictions. Id. at 476. The aggravator relied upon by the State here is therefore specifically excluded under Apprendi.

2. The death penalty is within the statutory range of punishment prescribed by the legislature for first degree murder. Tenn. Code Ann. § 39-13-202(c)(1). The Apprendi holding applies only to enhancement factors used to impose a sentence above the statutory maximum. Apprendi, 530 U.S. at 481. It is on this basis that the Court in Apprendi addressed and rejected the concern that the principles governing its decision would invalidate state capital sentencing procedures requiring judges to find aggravating factors before imposing the death penalty. Id. at 496-97. The Court noted that such a sentencing procedure does not allow a judge to determine the existence of a factor

making the crime a capital offense.  Id. at 497.  Instead, the judge is called upon to decide whether the death penalty, the maximum penalty allowable under the capital statute, should be imposed.  Id.

3. District attorneys in Tennessee are required to notify capital defendants no less than thirty days before trial of the intent to seek the death penalty and must specify the aggravating circumstances upon which the State intends to rely during sentencing.  Tenn. R. Crim. P. 12.3(b).  Rule 12.3(b) therefore satisfies the requirements of due process and notice.  See State v. Golphin, 533 S.E.2d 168, 395-97 (N.C. 2000) (statute setting forth the aggravating circumstances the jury may consider provides sufficient notice to satisfy the constitutional requirements of due process).

4. Tennessee's capital sentencing procedure requires that a jury make findings regarding the statutory aggravating circumstances. Tenn. Code Ann. § 39-13-204(f)(1), (i). The Apprendi holding applies only to sentencing procedures under which judges sentence the defendants.  Apprendi, 530 U.S. at 476.

5.  Tennessee's capital sentencing procedure requires that the jury find any statutory aggravating circumstance beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-204(f)(1), (i). The Tennessee statutes therefore comply with the "beyond a reasonable doubt" standard required by Apprendi.  Apprendi, 530 U.S. at 476.

Based upon these distinctions, we hold that the principles of Apprendi do not apply to Tennessee's capital sentencing procedure.  Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution.

SEPARATE JURIES

Dellinger and Sutton filed a pretrial motion requesting a severance or, in the alternative, separate juries.  At the April 20, 1994, hearing on the motion, however, the defendants abandoned their motion for a severance, instead asking that the court grant them separate juries at the same trial.  They argued that separate juries at one trial would serve the same purpose as a severance without prolonging the trial process.  The trial court overruled the motion, ordering that any evidence that might be inadmissible against one of the defendants would not be allowed into evidence.  The court therefore found no reason preventing both defendants from receiving a fair trial before the same jury.

We first note that there is no precedent in Tennessee allowing separate juries.  Other jurisdictions have allowed multiple juries in a joint trial to alleviate the duplication of effort required in severed trials. See Adam Hersh, Criminal Law:  Joint Criminal Trials with Multiple Juries:  Why They Are Used and Suggested Ways to Implement Them, 73 Fla. Bar J. 72, 72 (1999).  "The procedure essentially is a grant of severance, but within a framework permitting single presentation of overlapping evidence."  Id.  Some jurisdictions allowing multiple jury trials cite as supporting authority the broad discretion allowed a trial court in granting partial or total severance.  See, e.g., U.S. v. Rowan, 518 F.2d 685, 690 (6th Cir. 1975); People v. Church, 429 N.E.2d 577, 584 (Ill. App.

Ct. 1981); State v. Corsi, 430 A.2d 210, 211-13 (N.J. 1981). Similarly, the decision to grant or deny a severance, governed by Rule 14 of the Tennessee Rules of Criminal Procedure, is within the sound discretion of the trial court. State v. Carruthers, 35 S.W.3d 516, 552-53 (Tenn. 2000). There is no prohibition against the use of a multiple jury trial as a form of severance in the Tennessee Rules of Criminal Procedure. Courts have cautioned, however, that the multiple jury procedure is "rife with the potential for error or prejudice." Hersh, supra, at 73 (quoting Velez v. State, 596 So. 2d 1197, 1199-1200 (Fla. Dist. Ct. App. 1992)); see also Corsi, 430 A.2d at 213 (expressing concern for the enhanced possibility of error and amount of time required in the complicated procedure required to protect the rights of defendants in a multiple jury trial). Even those courts allowing multiple jury trials admonish that they be used only in relatively uncomplicated cases requiring little movement of the juries in and out of the courtroom and ensuring thorough separation of the juries throughout the proceedings. See, e.g., Corsi, 430 A.2d at 213. We do not condone the practice in Tennessee at this time when no rule has been implemented to specifically address the practical considerations necessary for safeguarding defendants' rights under the multiple jury procedure. See Hersh, supra, at 73-74 (noting the need for separate voir dire for each defendant, individual opening and closing statements for each defendant, cross-examination of prosecution witnesses out of the presence of the co-defendant's jury, and separate jury instructions and deliberation rooms for each jury). We therefore find no abuse of discretion in the trial court's refusal to grant separate juries to the defendants in this case.

Moreover, we find no error in the trial court's refusal to grant a severance of the defendants in this case. Rule 14(c)(2) requires the severance of defendants when necessary to reach "a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(i), (ii). Severance is not required when the evidence admitted at trial would have been admissible against each defendant at separate trials. State v. Little, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992); State v. Hammonds, 616 S.W.2d 890, 896 (Tenn. Crim. App. 1981). Although Sutton claims that the evidence of the .303 rifle and shells discovered at Dellinger's trailer were improperly admitted against Sutton, we find no support for his contention. See People v. King, 63 Cal. Rptr. 345, 348-49 (Cal. Ct. App. 1967) (in light of the joint commission of the offense, the victim's hearing aid found on one defendant was admissible as evidence against his co-defendant); People v. Cartalino, 444 N.E.2d 662, 670 (Ill. App. Ct. 1982) (bullets found in the possession of the defendant's accomplice were admissible against the defendant because of proof connecting the defendant and the bullets with the crime). A thorough review of the record reveals no admitted evidence that was improper as to one of the defendants. The trial court's decision to deny the request for a severance or, alternatively, for separate juries, was therefore within the sound discretion of the court.

## JURY SELECTION EXPERT

The trial court initially granted the defendants' request for a jury selection expert. Margie Fargo thereafter assisted the defendants in selecting a jury that the trial court subsequently declined to empanel, apparently because the jury pool was too small. The trial court sua sponte ruled that it would not authorize funding for a jury selection expert in future proceedings, finding that defense

counsel had obtained sufficient knowledge from working with Fargo during the first jury selection. The trial court found that further employment of Fargo was unnecessary to secure a fair trial, particularly in light of defense counsel's experience. Dellinger and Sutton maintain that, having established a "particularized need" for the jury selection expert, they were not required to meet that threshold level of proof a second time and that the trial court's revocation of funds for the expert was therefore error.

A defendant must show a "particularized need" for the appointment of an expert. State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992). To prove "particularized need" a defendant must establish that the defendant cannot receive a fair trial without the expert's assistance and that there exists a reasonable likelihood that the expert will materially assist preparation of the defense. State v. Scott, 33 S.W.3d 746, 753 (Tenn. 2000). The decision to award funds for employment of an expert rests in the sound discretion of the trial court. Tenn. Code Ann. § 40-14-207(b); State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994). Dellinger and Sutton find support for a "particularized need" in their assertion that the death penalty is rarely imposed in cases in which a jury selection expert is used by the defense. They further maintain that withdrawal of expert services once approved is unconstitutional.

We hold that the trial court was not obligated to grant the use of a jury selection expert during the selection of the first jury in this case. The Court of Criminal Appeals held that the defendants' conclusory statement that a jury selection expert is necessary for an effective defense in every capital case is insufficient to establish a particularized need. We agree. As we stated in State v. Black, 815 S.W.2d 166, 179-80 (Tenn. 1991), the appointment of a jury selection expert is not necessary when the record fails to show that the expert would have materially assisted the defense or that the defendant was deprived of a fair trial.

There having been no entitlement to the jury selection expert in the first jury selection process, we find no error in the trial court's decision to deny funding for the continued use of the expert in the second jury selection process. We agree with the Court of Criminal Appeals that defense counsel had ample jury trial experience and had the further benefit of information gained from the use of Fargo during the first jury selection process. Dellinger and Sutton cite no authority, and we find none, in support of their position that revoking funds for the jury selection expert violated their constitutional rights. The defendants in this case received a fair trial, and we hold that the trial court did not abuse its discretion in refusing funds for the continued use of a jury selection expert.

VALIDITY OF THE SEARCH WARRANT

On February 28, 1992, Detective Jim Widener of the Blount County Sheriff's Department, accompanied by other officers from the Blount County and Sevier County Sheriffs' Departments, executed a search of the premises owned by Dellinger. Numerous items were seized as a result of the search, including a .303 rifle and ammunition, a Mossberg shotgun barrel, and multiple shotgun shells. Dellinger filed pretrial motions to suppress as evidence any of the items seized from his

property. He alleged that the search warrant used to search his property and seize the items was invalid and that the search and seizure were not lawfully conducted. The trial court overruled Dellinger's motions.

Dellinger challenges the validity of the search warrant based on several grounds. First, he alleges that the search warrant is invalid on its face for failing to provide supporting facts that create a nexus between the crime and the place to be searched. See State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981). The affidavit accompanying the search warrant recited that Dellinger and Sutton were involved in a fight with Griffin on the night of February 21; Griffin's trailer, which burned later that night, was in close proximity to Dellinger's residence; Griffin was last seen alive when Dellinger and Sutton bailed him out of jail the same night; Griffin had been shot with a 12-gauge shotgun; and two spent Remington Peters brand 12-gauge buckshot "00" hulls were found near his body. The affidavit further stated that the search would be for a 12-gauge shotgun and Remington Peters brand 12-gauge "00" shells. Based upon these facts, it was reasonable to conclude that Dellinger had been involved in Griffin's murder and that the murder weapon might be at Dellinger's residence. The facts set forth in the affidavit create a nexus between the crime and the property to be searched. See State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993) ("Where the object of the search is a weapon used in the crime . . . the inference that the items are at the offender's residence is especially compelling."). Dellinger's claim is therefore without merit.

Dellinger next argues that the search warrant is invalid based upon the statement in the affidavit that Dellinger and Sutton were involved in a fight with Griffin at 7:11 p.m. on February 21, 1992. Dellinger maintains that the statement is false and misleading. An affidavit sufficient on its face may be impeached if it contains "a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause" or "a false statement, essential to the establishment of probable cause, recklessly made." State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978).

Detective Widener admitted that he had not witnessed the fight and that the witnesses who did see the fight were not able to identify Dellinger or Sutton. We agree, however, with the trial court and the Court of Criminal Appeals that the statement was a reasonable conclusion based upon the information Detective Widener obtained during his investigation. Widener knew from the bartenders at Howie's that Dellinger and Sutton were there with Griffin until approximately 7:00 p.m. on February 21 when they left in a dark-colored Camaro. Witnesses observed three men around 7:11 p.m. fighting in a dark-colored Camaro down the road from Howie's. When Griffin was arrested later that night, he told the arresting officer that he had just been in a fight with friends. Officer Widener's statement that Dellinger and Sutton were involved in a fight with Griffin on the night in question was a reasonable conclusion based upon these facts within the officer's knowledge at the time the affidavit was sworn. Moreover, the State established during the suppression hearing that the judge issuing the warrant was aware that Officer Widener's information came from citizen informants. The statement was not a false statement recklessly made or made with intent to deceive the Court.

Dellinger also complains that Detective Widener failed to comply with Rule 41(c) of the Tennessee Rules of Criminal Procedure, requiring that a copy of the search warrant be left with the person on whom it is served. Rule 41(c) states that failure to leave such a copy "shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure." Tenn. R. Crim. P. 41(c). Dellinger's wife testified that she was at home when the search warrant was executed and that Detective Widener did not leave a copy of the search warrant with her. Detective Widener testified, however, that he did leave a copy of the search warrant with Dellinger's wife. Dellinger notes that the warrant does not indicate that a copy was left with Dellinger's wife. However, Rule 41(c) does not require that the warrant include any such notation. By upholding the search warrant's validity, the trial court impliedly credited Detective Widener's testimony over that of Dellinger's wife. This Court will not set aside a trial court's judgment at the conclusion of an evidentiary hearing unless the evidence in the record preponderates against the trial court's findings. State v. Killebrew, 760 S.W.2d 228, 233 (Tenn. Crim. App. 1988). We hold that the evidence does not preponderate against the trial court's findings on this issue.

Rule 41(c) also requires the magistrate issuing the warrant to endorse upon the warrant the hour, date, and name of the officer to whom the warrant is issued. Tenn. R. Crim. P. 41(c). Dellinger argues that the warrant in this case is invalid due to improper endorsement. Examination of the search warrant, however, shows that the warrant was issued to Jim Widener on February 28, 1992, at 2:25 p.m. The warrant complies with the endorsement requirement of Rule 41(c).

Section 40-6-104 of the Tennessee Code Annotated requires that the magistrate issuing the warrant first "examine on oath the complainant and any witness the complainant may produce, and take their affidavits in writing, and cause them to be subscribed by the persons making them." Dellinger argues that the warrant is invalid because the supporting affidavit does not state the time that it was sworn, and it therefore cannot be established that the magistrate issued the warrant after the affidavit was sworn. In its opening lines, the search warrant states in part, "Proof by affidavit *having been made* before me. . . ." (Emphasis added). By its terms, then, the search warrant indicates that there was prior proof by affidavit. The search warrant complies with § 40-6-104.

Dellinger next asserts that officers from Blount County were not authorized to execute a search warrant in Sevier County. Detective Widener, who executed the search warrant on Dellinger's property in Sevier County, was an officer in the Blount County Sheriff's Department. However, other officers from the Sevier County Sheriff's Department accompanied Detective Widener to Dellinger's residence. Also, the warrant itself is addressed "to the sheriff, any constable or any peace officer of said [Sevier] county." Rule 41(c) allows service of a warrant by any peace officer with authority in the county in which the warrant is issued. Tenn. R. Crim P. 41(c). This Court rejected a similar argument in State v. Smith, 868 S.W.2d 561 (Tenn. 1993). In Smith, the detective executing the search warrant in Robertson County was with the Metropolitan Nashville Police Department. Id. at 572-73. This Court held, however, that the warrant was not invalidated by the detective's participation in procuring and executing the warrant. Id. We hold that Officer Widener's participation in obtaining and executing the search warrant in this case did not invalidate the warrant.

-11-

Dellinger finally contends that the officers were not authorized to seize any spent shotgun shells other than the Remington Peters brand 12-gauge "00" shotgun shells specified in the search warrant. "There is no prohibition against the seizure of other property not specifically mentioned in a valid search warrant, if such is relevant to the crimes suggested by the warrant." State v. Wright, 618 S.W.2d 310, 318 (Tenn. Crim. App. 1981). We agree with the Court of Criminal Appeals that any 12-gauge shotgun shells found on Dellinger's property were relevant to the murder of Griffin based upon the evidence showing that Griffin was shot and killed with a 12-gauge shotgun. The officers' seizure of non-Remington Peters brand 12-gauge shotgun shells was a reasonable extension of the search and seizure outlined in the warrant in this case. See Jones v. State, 523 S.W.2d 942, 946 (Tenn. Crim. App. 1975) ("after a lawful entry on the premises through a search warrant, the question of whether or not an officer can make an added seizure depends upon its reasonableness"). We therefore conclude that the search warrant is valid in this case and hold that no error occurred in its execution. The trial court properly overruled Dellinger's motions to suppress evidence seized in the search of his property.

## SUFFICIENCY OF EVIDENCE ESTABLISHING THE "PRIOR VIOLENT FELONY" AGGRAVATING CIRCUMSTANCE

Dellinger and Sutton maintain that the State failed to carry its burden of proof in establishing the "prior violent felony" aggravating circumstance. Tenn. Code Ann. § 39-13-204(i)(2). Specifically, they assert that the State did not prove that they were the same defendants named in the judgments of conviction for the prior felonies. We disagree. Scott Greene, Assistant District Attorney General for Sevier County, testified that he knew both defendants, that he was present at trial when they were convicted of first degree murder in 1993, and that he prepared the judgment forms signed in the cases. He then identified Dellinger and Sutton as the same defendants convicted in the Sevier County murder.

This case is distinguishable from State v. Williams, No. 03C01-9302-CR-00050, 1996 Tenn. Crim. App. LEXIS 211 (Tenn. Crim. App. Apr. 2, 1996), cited by Dellinger and Sutton. In Williams, the only evidence presented to prove the (i)(2) aggravating circumstance were certified copies of the judgments. Id. at *14. The Court of Criminal Appeals held that the evidence was insufficient alone to establish the identity of the defendant as the same Roger Williams convicted of the prior felony. Id. at *14-15. This Court has similarly held that a certified copy of a judgment merely creates a permissive inference of identification. See Lowe v. State, 805 S.W.2d 368, 371-72 (Tenn. 1991). In the current case, however, the testimony of Assistant District Attorney General Greene, in addition to the certified copies of the prior judgments, was sufficient to establish the "prior violent felony" aggravating circumstance.

Dellinger and Sutton also assert that the Branam murder does not constitute a "prior violent felony" under the definition of Tenn. Code Ann. § 39-13-204(i)(2) because it occurred after Griffin's murder. We have repeatedly rejected this argument in prior cases and decline to revisit the issue

here.  See, e.g., State v. Stout, 46 S.W.3d 689, 719 (Tenn. 2001); State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997); State v. Nichols, 877 S.W.2d 722, 736 (Tenn. 1994).[4]

## INSTRUCTION ON IDENTITY OF THE DEFENDANTS

Dellinger and Sutton argue that they were denied due process because the trial court did not instruct the jury that the identity of the defendants in the prior convictions must be proven beyond a reasonable doubt.  Section 39-13-204 of the Tennessee Code Annotated requires proof of any statutory aggravating circumstance beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-204(f)(1), (i).  The State must prove beyond a reasonable doubt that the defendant in the conviction used for the (i)(2) aggravating circumstance is the same person as the defendant in the current case.  Cf. Lowe v. State, 805 S.W.2d 368 (Tenn. 1991) (discussing the improper shifting of the burden of proof to the defendant based upon an incorrect jury instruction).  In this case, the trial court properly instructed the jury that the State carried the burden of proving the aggravating circumstance beyond a reasonable doubt.  The instruction implicitly required proof beyond a reasonable doubt of the identity of Dellinger and Sutton as those persons previously convicted.  The jury is presumed to have followed the trial court's instructions.  Stout, 46 S.W.3d at 715.  As the Court of Criminal Appeals noted in its opinion in Williams, the trial court's instructions in that case specifically addressing the State's burden of proof for establishing the identity of the defendants under the (i)(2) aggravator were "very adequate."  Williams, 1996 Tenn. Crim. App. LEXIS 211 at *15.  We do not hold the specific instruction necessary, however, when a general instruction is given on the State's burden of proving each aggravating factor beyond a reasonable doubt.

## INSTRUCTION ON MITIGATING FACTOR THAT THE DEFENDANTS ARE HUMAN BEINGS

Dellinger and Sutton argue that the trial court erred in denying their request to include as one of the mitigating factors in the jury instruction that the defendants are human beings.  Section 39-13-204 of the Tennessee Code Annotated requires the trial court to instruct the sentencing jury "to weigh and consider any mitigating circumstances raised by the evidence," including, but not limited to, the mitigating factors enumerated in subsection (j).  Tenn. Code Ann. § 39-13-204(e)(1). At the time of the commission of the offense, § 39-13-204(e)(1) further required that no distinction be made between the statutorily-defined mitigating circumstances and the non-statutory mitigating circumstances requested by the defendant or the State.[5]  Dellinger and Sutton maintain that the

_____

[4]Dellinger and Sutton cite State v. Blouvett, 904 S.W.2d 111, 112 (Tenn. 1995), holding that a "prior conviction" under Tenn. Code Ann. § 40-35-106(b)(1) means a conviction that has been adjudicated prior to the commission of the offense for which sentence is to be imposed.  The holding in Blouvett, however, is limited to the specific statutes referenced in that opinion for sentencing felony offenders under the Tennessee Criminal Sentencing Reform Act of 1989.  The opinion is not relevant to our discussion of Tennessee's capital sentencing procedure.

[5]The amended language of § 39-13-204(e)(1) prohibiting reviewing courts from vacating a sentence on the ground that the trial court failed to instruct the jury as to a non-statutory mitigating factor was not in effect at the time

(continued...)

-13-

requested mitigating factor instruction was raised by the testimony of prison guard Kevin Eisenhower. Eisenhower agreed with defense counsel that, based upon Dellinger's behavior as an inmate, he is "deserving of respect as a human being." According to Dellinger and Sutton, the trial court's failure to instruct on this mitigating factor violated their Eighth and Fourteenth Amendment rights.

"The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime." Clemons v. Mississippi, 494 U.S. 738, 748 (1990). In Lockett v. Ohio, 438 U.S. 586 (1978), the United States Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer in a capital case be allowed to consider, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. The Court noted, however, that courts retain the authority to exclude irrelevant evidence not bearing on the defendant's character or prior record, or the circumstances of the offense. Id. at 605 n.12. "[T]he rule in Lockett is the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." Eddings v. Oklahoma, 455 U.S. 104, 110 (1982). Requiring the consideration of relevant mitigating factors recognizes that "a consistency produced by ignoring individual differences is a false consistency." Id. at 112.

The fact that Dellinger and Sutton are human beings is not relevant mitigating evidence. All criminal defendants are human beings. That fact, therefore, does not relate to the uniqueness of the individual defendant. Moreover, the species of the defendants does not bear on their character or prior record, or the circumstances of the offense. Nor did the prosecutor in any way question the fact that the defendants are human beings. Cf. State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (prosecutor's references to defendant as a "rabid dog" were "patently improper"). The instruction that the defendants are human beings was not relevant to mitigation and therefore was properly refused by the trial court.

JURY QUESTION REGARDING THE MANNER OF SERVING LIFE SENTENCES

During sentencing deliberations, the jury submitted a written question asking the trial court, "If James Dellinger and Gary Sutton were given life in prison from Sevier County and they are given life in prison in Blount County–will the prison terms be consecutive and/or concurrent?" The trial court responded in writing, "You should concern yourself with the sentences in these cases only." Dellinger and Sutton maintain that the sentencing process was prejudiced because the jury would be more likely to impose the death penalty without knowing when the defendants might be released if they were given a life sentence.

---

[5](...continued)
of the commission of the offense in this case.

The United States Supreme Court has held that the Federal Constitution neither requires nor prohibits instructions to capital sentencing juries on the possibility of commutation, pardon, or parole. California v. Ramos, 463 U.S. 992, 1013-14 (1983) ("the wisdom of the decision to permit juror consideration of possible commutation is best left to the States"). "It is true that Ramos stands for the broad proposition that we generally will defer to a State's determination as to what a jury should and should not be told about sentencing." Simmons v. South Carolina, 512 U.S. 154, 168 (1994).

This Court has previously addressed a similar question in State v. Smith, 857 S.W.2d 1 (1993). In Smith, the jury sent a note to the trial judge during sentencing deliberations asking that the court define life sentence, define consecutive and concurrent life terms and explain which would apply if a second life sentence were given, and explain when parole would apply. Id. at 10. The trial court declined to answer the jury's questions and instructed the jury to resume deliberations. Id. This Court approved the trial court's response to the jury's question. We held that instructions on the nature of life sentences, concurrent and consecutive sentencing, and parole eligibility create the possibility of jury speculation on the length of time a defendant would have to serve and could "breed irresponsibility on the part of jurors premised upon the proposition that corrective action can be taken by others at a later date." Id. at 11. This Court held that instructing the jury on such specific sentencing information could result in sentences of death based on sheer speculation and on factors not enumerated by statute and not sanctioned under the United States Constitution or the Tennessee Constitution. Id. We continue to adhere to this proposition and agree with the trial court's refusal to answer the jury's question in this case. See also State v. Burns, 979 S.W.2d 276, 295-96 (Tenn. 1998) (approving trial court's instructions to the jury to refer to the charges and instructions and continue deliberations in response to jury's specific sentencing questions).

PROPORTIONALITY REVIEW

Although Dellinger and Sutton raise the issue in their appellate brief, we are also bound by statute to review the application of the death penalty to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;

(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1). As previously discussed, we find the evidence sufficient to support application of the prior violent felony aggravator in this case. Having thoroughly reviewed the record, we find that the sentence of death was not imposed in any arbitrary fashion and that the evidence supports the jury's finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

We next are compelled to consider whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D).

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. Id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of the victim; and 8) capacity for rehabilitation. Id.

In the current case, the victim was shot in the back of the neck, destroying his brain stem, and left dead on a riverbank. The defendants were friends of the victim, and no clear motive was established at trial. The murder was premeditated, and no evidence was presented to show either provocation or justification.

Dellinger, a white male, was forty-one years old at the time of Griffin's murder. Sutton is also a white male and was twenty-seven years old at the time of the murder. Dellinger and Sutton were previously convicted of first degree murder for Branam's death, and Sutton also had a prior conviction for aggravated assault. No evidence was presented to show that Dellinger or Sutton cooperated with the authorities or showed any remorse for the killing. The evidence showed that both men have low- to medium-range IQs. Dellinger dropped out of school at the age of ten, and

-16-

Sutton dropped out of school in the eighth grade. Dellinger received little nurturing as a child and had developed a distrust of people from a young age. Sutton similarly distrusts people and was mentally and physically abused as a child. Testimony further showed that Dellinger has a borderline personality disorder and Sutton suffers from a depressive disorder and a mixed personality disorder with passive/aggressive and anti-social features. There was testimony presented showing that Dellinger and Sutton were both well-behaved prisoners and held a potential for rehabilitation. Considering the nature of the crime and the defendants, we conclude that this murder places both Dellinger and Sutton into the class of defendants for whom the death penalty is an appropriate punishment.

Dellinger and Sutton argue that the most similar case for purposes of proportionality review is their own prior case in the Branam murder. They urge this Court to find the imposition of the death penalty disproportionate in this case due to the jury's imposition of life sentences for the Branam murder, in which nearly the same evidence was submitted. See State v. Sutton, No. 03C01-9403-CR-0090, 1995 Tenn. Crim. App. LEXIS 565 (Tenn. Crim. App. Jul. 11, 1995). The very significant distinguishing factor in this case, however, is the use of the prior conviction for Branam's murder as an aggravating factor in sentencing for Griffin's murder.

There have been several previous cases involving shooting deaths of friends or acquaintances in which the death penalty was imposed based upon the prior violent felony aggravating circumstance. In State v. Taylor, 774 S.W.2d 163 (Tenn. 1989), the defendant was convicted of first degree murder in the shooting death of a friend. After another friend shot the victim in the head, Taylor shoved the victim out of the car in which they were riding. Id. at 164. Taylor then exited the vehicle, shot the victim as he lay on the street, and helped remove the victim's shoes and money. Id. The jury sentenced Taylor to death, finding that the murder was committed during the commission of robbery and that Taylor had a prior violent felony conviction. Id. at 164, 166.

In State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984), the defendant was convicted of first degree murder after shooting an acquaintance in the back of the head with a shotgun. Testimony indicated that Caldwell believed the victim may have been having an affair with Caldwell's wife. Id. at 462. Caldwell informed police that he "went crazy" and shot the victim after the victim made sexual advances toward Caldwell and his son and after the victim threw whiskey in Caldwell's eyes. Id. The jury sentenced Caldwell to death based upon the prior violent felony aggravating circumstance. Id. at 462, 464-65.

In State v. Moore, 614 S.W.2d 348 (Tenn. 1981), the defendant was convicted of first degree murder after abducting a former roommate at gunpoint and shooting him twice in the head and once in the chest. Id. at 349. Moore attempted to conceal the body in underbrush and returned two days later to shoot away the victim's hands, feet, face, and teeth with a shotgun for the purpose of preventing identification of the body. Id. Moore was sentenced to death after the jury found that the murder was committed during the commission of a kidnapping and that Moore was previously convicted of a violent felony. Id. at 349, 350-51.

Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder in which either life imprisonment or a sentence of death has been imposed, we conclude that the following additional cases in which the death penalty was imposed also bear similarities with the current case. See State v. McKinney, No. W1999-00844-SC-DDT-DD, 2002 Tenn. LEXIS 155 (Tenn. Mar. 26, 2002) (defendant, who had been drinking, shot nightclub security guard in the back of the head and was sentenced to death based upon the prior violent felony aggravating circumstance); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (defendant, who had been drinking and smoking crack, shot victim during a robbery and was sentenced to death based on the sole aggravating factor that defendant had previously been convicted of a violent felony); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (defendant convicted of felony murder for shooting death during robbery of grocery store was sentenced to death based on sole aggravating circumstance that defendant had prior violent felony conviction); State v. Howell, 868 S.W.2d 238 (Tenn. 1993) (defendant with brain damage, learning disabilities, and eighth-grade education sentenced to death for shooting convenience store clerk during robbery based upon jury's finding that murder was committed during robbery and that defendant had prior violent felony conviction). After reviewing these cases, and many others not specifically cited, we are of the opinion that the penalty imposed by the jury against each defendant in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate.

We have reviewed all of the issues raised by the defendants and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are attached as an appendix. The defendants' sentences of death are affirmed and shall be carried out on the 17th day of September, 2002, unless otherwise ordered by this Court or proper authority. It appearing that the defendants James Henderson Dellinger and Gary Wayne Sutton are indigent, costs of this appeal are taxed to the State.

_____
JANICE M. HOLDER, JUSTICE