IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 27, 2019

FILED
10/17/2019
Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. CHRISTOPHER LEVI PARKER**

**Appeal from the Criminal Court for Hamilton County**
**No. 291602   Barry A. Steelman, Judge**

———————————————————————

**No. E2018-01306-CCA-R3-CD**

———————————————————————

The Defendant-Appellant, Christopher Levi Parker, was convicted by a Hamilton County jury of first-degree premeditated murder and sentenced to life in prison.  In this appeal as of right, he raises the following issues for our review: (1) whether the evidence is sufficient to support the Defendant's conviction of first-degree premeditated murder; and (2) whether the trial court erred in allowing the State to admit proof that the Defendant stole a gun that was consistent with the murder weapon the night before he shot and killed the victim.  Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Donna Miller (on appeal), and Andrew S. Basler (at trial), Chattanooga, Tennessee, for the Defendant-Appellant, Christopher Levi Parker.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle and Lance Pope, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On February 1, 2014, the Defendant shot the victim, Robbie McClure, one time in the head, resulting in his death.  The Defendant admitted that he shot and killed the victim, but he argued that he lacked the necessary mental state to establish premeditation because he was highly intoxicated on methamphetamine.

Prior to trial, the Defendant filed a motion to exclude allegations of other crimes or bad acts; specifically, that the Defendant stole a gun the day before he shot and killed the victim. On October 24, 2016, the trial court held a Rule 404(b) hearing. Dale Craghead testified that he travelled from his home in Lincoln, Nebraska, to Chattanooga, Tennessee, on January 31, 2014, to meet Jessica Ridley, whom he had met previously and communicated with online and by phone. He said that he brought his laptop, his cell phone, his personal belongings, and a Springfield XD-9 pistol with him. The pistol was loaded with Federal Plus P Plus ammunition. He met Ridley downtown, and they got a hotel room at the Days Inn on Carter Street. He stated that he checked into the hotel room in the early afternoon, Ridley came over, and he fell asleep. When he woke up, the Defendant was in his hotel room with Ridley. He testified that three additional people came to his hotel room that evening, that they all left before he fell asleep again that night, and that his laptop and cell phone were still in the room when those people left. He asserted that he did not use any drugs that night, but he did have a "couple small drinks." When Craghead awoke in the early morning hours of February 1, 2014, he was alone in his hotel room, and he discovered that his laptop, his cell phone, and his pistol had been stolen. He tried to text and email his phone without success and subsequently called the police. Craghead stated that he had never met the Defendant prior to that night.

On cross-examination, Craghead admitted that he never saw the Defendant take his gun and that he was not sure if he still had his gun when the three, unidentified people left his hotel room. He asserted, however, that those three people never went near his jacket, which was where he stored his gun. Craghead stated that he sent pictures of the ammunition that he had loaded into the Springfield XD-9 pistol before it was stolen to the Chattanooga Police Department, and he brought a round of that ammunition to the hearing, which was introduced as an exhibit. Craghead compared the photograph of the spent shell casing from the crime scene, which was also introduced as an exhibit, with the round that he brought to the hearing. He testified that they were the same. Craghead also testified that he had only bought this type of ammunition one time, as compared to thousands of rounds of other 9 milli-meter ammunition that he had purchased in the past.

Jessica Ridley testified that she was good friends with both the Defendant and the victim prior to the victim's death. She stated that she met Craghead at the Days Inn in Chattanooga, Tennessee, on January 31, 2014. The Defendant came to the hotel room at Ridley's request. She testified that she and the Defendant were drinking and using methamphetamine and marijuana but that Craghead did not use any drugs. She stated that she fell asleep after Craghead and that she awoke to the Defendant "tapping on [her]" with a gun. The Defendant told Ridley, "Let's go[,]" and he dropped her off at a friend's house. She admitted on cross-examination that she had probably been awake for ten days at that time, and she believed that the Defendant had been awake for a while as well. She

described the Defendant as "out of it[,]" and she stated that she had never seen him like that before.

The State introduced the lab report from the firearms examiner, as well as the shell casing that was recovered from the victim's house after he was shot. The trial court compared the spent shell casing with the live round that Craghead brought to the hearing, and he determined that they were "apparently identical." The trial court found "clear and convincing evidence that [the Defendant] had taken the firearm belonging to…Craghead." The trial court also found "that the evidence that [the Defendant] possessed the murder weapon goes to his identity." The trial court explained that it did not find "that the theft of the pistol while under the great influence of methamphetamine [was] more prejudicial than just the fact that [the Defendant] was under the influence of methamphetamine." Therefore, the trial court found that the probative value of this evidence was not outweighed by the danger of unfair prejudice.

**Trial.** The following proof was adduced at the Defendant's trial, which occurred October 25-28, 2016. Dale Craghead testified consistently with his testimony from the 404(b) hearing. The trial court also revisited its 404(b) ruling and determined that the Defendant's prior bad act of stealing Craghead's gun could be used by the jury to establish the Defendant's intent in addition to his identity. The trial court found that there was clear and convincing evidence that the Defendant committed the theft. Jessica Ridley also provided testimony at trial that matched her testimony from the 404(b) hearing. In addition, Ridley stated that the Defendant had talked to her about the victim that night after they left the hotel room. She said that the Defendant had asked her why she was friends with the victim and that "[a]pparently they had something going on." She also stated that the Defendant called the victim "a bitch." On cross-examination, Ridley admitted that she and the Defendant had previously used marijuana and methamphetamine together and that they had used methamphetamine in Craghead's hotel room on January 31, 2014. She admitted that the Defendant appeared "agitated" and "spaced out" and that he never said anything about using a gun or hurting the victim. Ridley said that she felt pressured to cooperate with the police.

Jean Rogers, the custodian of records at the Hamilton County 911, testified that she pulled two calls related to the Defendant's case.[1] Marion Everest Roberson testified that he had lived on Hixson Avenue in Chattanooga, Tennessee, for 56 years. He described the layout of Hixson Avenue, particularly that, in February of 2014, there were two trailers uphill on the road. Roberson testified that he was sitting in his house on

---

[1] Although the calls were admitted into evidence and played for the jury, the CD's submitted in the appellate record are inoperable. While we are unable to review them, the CD's have no bearing on the issues raised in this appeal.

- 3 -

February 1, 2014, when he heard a gunshot come from the trailer across the street. He stated that he saw "three boys come out of the trailer and go walking up the street to those two old trailers up in the circle."

Officer Samuel Booker of the Chattanooga Police Department (CPD) testified that he received a call on February 1, 2014, to respond to 1334 Hixson Avenue. When he arrived at the residence, he located the victim's body with an "apparent gunshot wound to the head." Officer Booker did not locate anyone else at the victim's trailer when he arrived. He stated that he saw the victim upon approaching the front door. The victim's dog was standing next to the victim inside the trailer. The State then introduced a series of photographs, which depicted the outside of the victim's trailer, as well as the victim's body inside the trailer. On cross-examination, defense counsel elicited testimony from Officer Booker that the homicide investigator that responded to the crime scene had been terminated from CPD.

Officer Joseph Montijo, a CPD crime scene investigator, testified that he responded to 1334 Hixson Avenue on February 1, 2014. Based on Officer Montijo's investigation, the State admitted a red soda can found outside of the victim's trailer, a photograph of the deceased victim, a 9-millimeter spent shell casing, and several cigarette butts. Officer Montijo also collected several swabs from the residence.

Special Agent Chad Johnson, the quality assurance manager for the forensic services division of the Tennessee Bureau of Investigation (TBI), testified that he conducted DNA testing on the soda can and the cigarette butts that were collected from the scene. These tests showed the presence of the victim's DNA, as well as DNA from unknown contributors. The "touch swabs" conducted on the interior and exterior door handles also revealed the presence of only the victim's DNA. Special Agent Johnson also tested the Defendant's shoes for the presence of blood, and those tests were negative. He was also able to exclude the Defendant as a contributor to DNA under the victim's fingernails.

Andrew Biro, also known as "Bundy," was called as a witness by the State, but he refused to testify. The trial court found that Biro was unavailable pursuant to Tennessee Rule of Evidence 801(a)(2), and the State introduced his testimony from the preliminary hearing in this case. At the preliminary hearing, Biro testified that he and the Defendant were "lifelong friend[s]." He had also known the victim for several years. On February 1, 2014, Biro was walking his girlfriend to her mother's car from the trailer he was staying at on Hixson Avenue when a white truck pulled up, and the Defendant jumped out. The Defendant went into the trailer next to the place where Biro was staying. Biro testified that, when he went into the trailer, he saw that the Defendant had a pistol in his hand and was talking about going to the victim's house. On cross-examination, Biro

- 4 -

stated that the Defendant told him that he got the gun the night before. Biro then walked to the victim's trailer with the Defendant and Jacob Keel, also known as T.Y. Biro stated that he decided to go to the victim's house because he knew there was "supposed to be a one-on-one fight" between the Defendant and the victim.

Biro went into the victim's trailer first, followed by Keel and the Defendant. The Defendant then asked the victim, "Why do you have my name in your mouth?" The victim responded, "I don't know what you're talking about, dude." Biro pleaded with the Defendant, saying "Please chill, Chris, chill, chill, chill, chill[,]" when the Defendant pulled the trigger and killed the victim. Biro testified that he panicked, went out the back door, and tried to call his mom. He said that the Defendant threatened him, saying "[I]f anybody finds out and anybody knows anything and tells anything, that [he] would be shot and killed next." He said that the victim's "hands were down" when the Defendant shot him. When Biro's mom picked him up, they called 911.

Jacob Keel was called by the State and also refused to testify. Kimberly Fisk testified that she was in a relationship with the Defendant in February 2014. She stated that the Defendant had two phones at the time. She said that the Defendant came to her house on the morning of February 1, 2014, left to take his son to his aunt's house, and came back later that night. She told the Defendant to leave her house because she had seen him on the news for murder, and the Defendant left with his mother. The State introduced photographs of the phone that the Defendant had when he was arrested. On cross-examination, Fisk testified that the trailers on Hixson Avenue were known as "dope house[s]." She admitted that the Defendant was a drug addict, and they were all using drugs "pretty heavily." She testified that the Defendant had never said anything to her about killing the victim. She also did not know the Defendant had a gun.

Tim Pickard, a fugitive investigator with CPD, testified that, on February 1, 2014, he was asked to assist the police department in locating the Defendant. Investigator Pickard and two other investigators responded to the Defendant's girlfriend's address, where they observed a running car parked in the driveway. When the car drove off, Investigator Pickard conducted a traffic stop on the car in the parking lot of a gas station. The Defendant's mother was identified as the driver of the car, and officers located the Defendant in the passenger seat. Investigator Pickard arrested the Defendant and collected several items from the car, including the Defendant's cell phone and his jacket. The Defendant's cell phone was entered as an exhibit, and Investigator Pickard stated, "It appears the phone has been broken and the battery has been removed from the cellphone." He said that the phone had been "taken apart" when he recovered it from the passenger side of the car.

- 5 -

Investigator William Salyers, a latent fingerprint examiner with CPD, testified that he was employed in the crime scene unit of the CPD on February 1, 2014. Investigator Salyers performed gunshot residue tests on the Defendant and Biro, which he photographed. He also collected a buccal swab from the Defendant, and he collected all of the Defendant's clothing. Mark Lawrence Hamilton, a technical forensic scientist with CPD, testified that he downloaded the information from the Defendant's cellphone and created an extraction report. This report was entered as an exhibit at trial. Hamilton testified that the software used to complete this report could recover deleted information from the cellphone. Hamilton said that there were items on the extraction report that said "deleted[,]" and he was able to recover the deleted information.

Special Agent James Russell Davis, II, a forensic scientist with the TBI, testified that he did not find elements indicative of gunshot residue on the Defendant's hands. However, he did find elements of gunshot primer residue on the Defendant's jacket.

Dr. Steven Cogswell, the deputy chief medical examiner for Hamilton County, testified that he performed the autopsy of the victim. He determined that the victim's cause of death was "gunshot wound of [the] head." Dr. Cogswell also determined from the toxicology report that the victim had a lethal concentration of methamphetamine in his system. However, he concluded that methamphetamine overdose was not the cause of the victim's death. Dr. Cogswell testified that the bullet entered the victim's head above his left eyebrow and became lodged under the scalp behind the victim's left ear. He found that, due to the pattern of the victim's injuries, the victim had been shot from only a few inches away. The State then questioned Dr. Cogswell about his experience with firearms and re-introduced a photograph of the Defendant's hands. The photograph showed that the Defendant was missing his index finger on his right hand. Dr. Cogswell testified that someone with a missing index finger could still fire that type of weapon with what remained of the index finger or with their middle finger. On cross-examination, Dr. Cogswell testified as to the effects that a high dose of methamphetamine would have on a person. He also agreed that the gun could have been shot from closer than a few inches away. He asserted that the gun could have been fired from either a right or a left hand.

Alex Brodhag, a firearms examiner with the TBI, testified as an expert in firearms examination and ballistics comparison. He testified that he received a "fired, jacketed, hollow point bullet recovered from [the victim's] head, and a cartridge case recovered from the scene." Following testing, Agent Brodhag found that the rifling characteristics on the bullet recovered from the victim were common to a number of 9-millimeter weapons, including Springfield Incorporated. He also examined the 9-millimeter cartridge case recovered from the scene, and he determined that it was a "Federal 9-millimeter" "Plus P Plus." Agent Brodhag brought a Springfield XD-9 to trial, along

with dummy ammunition to demonstrate the operation of loading the gun and its safety features. He stated, "[I]n order to fire this at this point, you'd have to grip it properly, depress the grip safety, and pull the trigger." He said the gun was designed with several safety features to "reduce the likelihood of an accidental discharge."

Cathy Goforth, a criminal investigator with the Hamilton County District Attorney's office, testified that she was trained in the Securus jail call system. She stated that the Defendant used a free phone in the jail to call his mother on the day before his trial began. Goforth attended a pretrial meeting with Andrew Biro, and she was aware that he went by the nickname "Bundy." Thereafter, the State introduced and played for the jury a redacted version of the phone call that the Defendant made to his mother on October 24, 2016. He told his mother that he "just got word… to somebody that was at Silverdale that was in the same room as Bundy." He said that he let people know that Biro was testifying which is "the biggest no-no you could do." He also said he got word to Biro that he could "save face with his little gang," and that "these [Aryan] Nation boys wanted to beat his ass." Goforth testified as to the contents of this call as follows:

> State: Ms. Goforth, when did you locate that jail call?
> Goforth: Last night.
> State: There's a reference on the jail call to Silverdale; is that correct?
> Goforth: That's correct.
> State: Where is Silverdale?
> Goforth: Silverdale is kind of on the farther end of the county out toward Ooltewah and that area here in Chattanooga, in Hamilton County.
> State: Is that where Andrew Biro was housed?
> Goforth: It is.
> State: So "getting word out there" would be getting jail--from down here at the jail to Silverdale; is that correct?
> Goforth: Yes.

On cross-examination, Goforth agreed that she had met with Biro the week before trial, and he was "not happy" about having to testify in the Defendant's case. Biro told the State that he did not want to testify because of "social pressures from this case." She asserted that she did have a previous indication that the Defendant was trying to keep Biro from testifying, based on what the Defendant said to Biro after he shot the victim.

Jacob Keel, also known as "T.Y.," testified on behalf of the Defendant. He testified that he was on Hixson Avenue on February 1, 2014. He stated, "I was at two different places [on Hixson Avenue]: a trailer on top of the hill and then a trailer down, downhill." Keel testified that he had known the Defendant for twelve or thirteen years, and he knew that the Defendant used marijuana and methamphetamine. He stated that

the Defendant "just showed up to the trailer [he] was at on top of the hill" on February 1, 2014. He described the Defendant as "just bleary, just like he wasn't all there, his mind wasn't all there." He believed the Defendant had been awake for a while. Keel did not personally observe the Defendant consume any drugs that day.

Keel testified that he walked to the victim's trailer with the Defendant. He described the Defendant's interaction with the victim as follows:

> They--it was all right at first, then they got to arguing, and then they stopped. Like I said, I mean, everybody was friends. They were friends, to my knowledge, you know. That's how I met the man.

> But everything was cool for a little while, then they got into it again, they going back and forth arguing. [The Defendant] pulled out a gun. They arguing. I don't think [the victim], you know, he ain't, he ain't , he ain't believe that--you know what I'm saying?-- gun was going to go off or anything like that. I mean, he had his head against it, like, whatever, just like you know you going to mess up your life like that, you know what I'm saying? I mean, he was bucking the gun, whatever, so I mean, I don't-- ain't nobody fixing to just do that.

Keel testified further that, prior to this time, the Defendant had never given him any indication that he was going to the victim's trailer to kill him. He said that the Defendant "flipped out" after he shot the victim, and the Defendant was yelling, "That's life." He reasserted that the Defendant "wasn't in his right mind" that day. He stated that Biro also had a black pistol on him when they went to the victim's trailer.

On cross-examination, Keel admitted that Biro did not shoot the victim. He admitted that the Defendant told him that the victim was mad at him. He was also aware that the Defendant was mad at the victim. He admitted that the Defendant and the victim began arguing, and the Defendant pulled out a gun and put it to the victim's head. He described the situation as follows:

> They arguing, I mean they just--they arguing, whatever. [The Defendant] pulls out a gun, he puts it up to his head. They still arguing with each other. [The victim's] got his head against the gun, he's pushing against it, whatever. He's just, you know, not intimidated whatsoever, you know. I mean, he's not, like I said, I don't, I don't think he believed that the gun would have went off or [the Defendant] shot him or whatever. I don't think he believed it would happen. Like I said, everybody was friends. They

- 8 -

was just arguing.  Yeah, it went too far when he pulled out the gun, yeah, but during--I mean, mid argument, the gun goes off, it's--yeah.

He admitted that the Defendant told the victim that he would shoot him in the face. He testified that the Defendant shot the victim in the head.  He said after the Defendant shot the victim, the Defendant was "yelling, going off…flipping out."  He said the Defendant did not say he would kill him if he told anyone what happened, but he then admitted that the Defendant did say that to Biro.  On redirect examination, Keel asserted that he believed what happened was an accident.

Dr. John Standridge testified that he practiced addiction medicine and worked as a medical director at CADAS Drug and Alcohol Treatment.  He stated that he treated people suffering from methamphetamine intoxication "nearly daily[,]" as well as those suffering from chronic methamphetamine intoxication and methamphetamine psychosis. Dr. Standridge was tendered as an expert in methamphetamine intoxication.  He admitted that he could not give an opinion as to the Defendant's mental state on February 1, 2014. He stated that he had never met the Defendant.  Dr. Standridge explained the acute and chronic effects of methamphetamine, and he stated that methamphetamine has a half life of between 12 and 36 hours.  He described the symptoms of chronic methamphetamine intoxication as follows:

> Well I mentioned weight loss.  The foremost one we see is addiction. It's a very powerful addictive substance that changes the brain and creates the disease of addiction.  Now, one-time use isn't going to do that, but it doesn't take many uses because of its very strong euphoria property.
>
> Psychosis, mental illness, if you will, is drug-induced and very very common.  About half of methamphetamine users go on to develop amphetamine-induced psychosis with paranoia and delusions.
>
> Delusions are false thinking, false beliefs, and the most common one is delusions of persecution, which means they feel like somebody is demeaning them or saying bad things about them when they may be just speaking generally.
>
> Delusions of reference makes people think that they're talking about them, that person.  They take it personally.  They might hear a news report that says there was a shooting that took place on, you know, downtown, and then they might think, "Oh, they're saying I shot the person," when, you know, they weren't implying that at all.  So that's both a delusion of persecution and a delusion of reference.

Poor judgment, impaired memory, impaired cognition, an inability to think as well as one ordinarily could with, you know, a rational, sober mind. Again, many of the hypertension things.

The thing about chronic use is people lose the ability to feel good or to feel pleasure with normal things that would provide pleasure--say, a cheeseburger--and the only pleasure they can sometimes get is the acute rush of another dose of methamphetamine, so that causes constant craving.

Dr. Standridge compared methamphetamine psychosis to paranoid schizophrenia. He said that people suffering from methamphetamine psychosis could have hallucinations, depression, cognitive impairments, memory loss, and impaired judgment. Dr. Standridge testified that chronic methamphetamine use could lead to the following types of behaviors:

One of the most common there is sleep deprivation. People do tend to binge and crash as a behavior with, with the amphetamines, so they might go on three-to five-day binges where they don't eat, don't sleep. The sleep deprivation is another layer of issues impairing judgment, function, and control. And they are aggressive, violent, but the violent behavior is a particular marker for methamphetamine use. It's the only drug abuse that's statistically associated with an increased homicide rate.

He explained the effects of addiction, including loss of control. He testified that the Defendant's symptoms were "pathognomonic" with methamphetamine intoxication. On cross-examination, Dr. Standridge testified that there was a "correlation between undiagnosed mental disease and psychosis from methamphetamine use[.]" He stated again that he had never met the Defendant. The Defendant chose not to testify.

Based on the above proof, the jury convicted the Defendant as charged of first-degree premeditated murder, and the trial court imposed an automatic life sentence. On June 22, 2018, the trial court conducted a hearing on the Defendant's motion for new trial which was subsequently denied. The Defendant filed a timely notice of appeal, and this case is now properly before this court.

## ANALYSIS

**Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to support his conviction of premeditated first-degree murder. The Defendant asserts that he could not have committed premeditated first-degree murder because he

had been awake for days on methamphetamine, was in a methamphetamine psychosis, was arguing with the victim, and a witness told the police that he did not believe that the Defendant intended to shoot the victim. The State responds that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Here, the Defendant was convicted as charged of first-degree murder, which is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as:

an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).  The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense.  State v. Clayton, 535 829, 845 (Tenn. 2017) (citing State v. Dotson, 450 S.W.3d 1, 86 (Tenn. 2014); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)).  Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing.  State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Davidson, 121 S.W.3d at 615; Bland, 958 S.W.2d at 660.  In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing.  State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. Deb. 24, 1995) (citation omitted).

The Defendant argues that he did not have the ability to commit first-degree murder because he was "extremely high on methamphetamine at the time of the shooting."  "Intoxication itself is not a defense to prosecution for an offense.  However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state."  Tenn. Code Ann. § 39-11-503.  The Defendant relies upon language stating,

Voluntary intoxication is never a justification for a crime but its existence may negate a finding of specific intent.  If the accused is so intoxicated that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree; and, even when an intoxicated defendant is capable of forming specific intent, his drunkenness may be considered in determining whether he specifically intended the particular act for which he is on trial.

State v. Adkins, 653 S.W.2d 708, 713 (Tenn. 1983) (internal citations omitted).  While this is true, the State notes that "the weight to be given the evidence and the

determination of whether the voluntary intoxication negate[s] the culpable mental elements [are] matters for the jury." State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000). The jury heard and, by its verdict, rejected the testimony of several witnesses, including the Defendant's expert witness, that the Defendant appeared to be intoxicated on methamphetamine on the day that he shot the victim.

Viewing the evidence in the light most favorable to the State, the Defendant went to Dale Craghead's hotel room, used methamphetamine, and stole Craghead's gun. The Defendant talked to several people about the victim before walking down to his trailer on Hixson Avenue, calling the victim a "bitch" and stating that he was mad at the victim. Several eyewitnesses saw the Defendant with Craghead's gun. The Defendant, along with Keel and Biro, walked to the victim's trailer and almost immediately asked the victim, "Why do you have my name in your mouth?" The Defendant then put the gun to the victim's head and pulled the trigger. While the testimony from Biro and Keel show that the Defendant was "flipping out" after shooting the victim, each witness testified that the Defendant threatened to shoot one of them if they said anything. The Defendant tried to get rid of evidence by deleting text messages from his phone, breaking his phone, and removing the battery from it. The Defendant then made a phone call to his mother on the day before trial, trying to "get word" to Biro that it was a "no no" to "snitch." The Defendant said that if Biro refused to testify, his case would be dropped. He said that, by refusing to testify, he could "save face" with the Aryan Nation. This is more than sufficient proof for a reasonable jury to find the Defendant guilty of first-degree premeditated murder.

**404(b) Ruling.** The Defendant argues that the trial court erred by allowing the State to introduce evidence that he stole a gun the night before he shot and killed the victim because it is a prior bad act, and thus, precluded under Tenn. R. Evid. 404(b). The State responds that the trial court properly admitted this evidence for the non-propensity purposes of intent and identity. While this evidence was improperly admitted for identity purposes, any error in its admission was harmless because the trial court properly admitted the evidence at trial for purposes of showing the Defendant's intent to commit first-degree premeditated murder.

Evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Tenn. R. Evid. 404(b).

Rule 404(b) states:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with the rule's requirements, the court's ruling will not be overturned absent an abuse of discretion. Id. (citing State v. Kiser, 284 S.W.3d 227, 288-89 (Tenn. 2009); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Because the record reflects that the trial court complied with the requirements of Rule 404(b), our standard of review is an abuse of discretion. Although the trial court initially improperly admitted this evidence for the purpose of establishing the Defendant's identity, see State v. Jones, 450 S.W.3d 866, 892 (Tenn. 2014) (citing White v. State, 533 S.W.2d 735, 739 (Tenn. Crim. App. 1975)), upon revisiting its ruling during

trial, the trial court properly determined that the theft of the pistol was probative of the Defendant's intent to commit the charged offense of first-degree premeditated murder. The trial court determined that there was clear and convincing evidence that the Defendant stole the gun, and that the Defendant's intent was at issue as "he had an intent to use the gun by taking the gun[.]" We agree. Indeed, evidence that the Defendant stole a pistol the night before he shot and killed the victim was relevant for the non-propensity purpose of showing his intent. The Defendant is not entitled to relief.

## CONCLUSION

Accordingly, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE